James M. WALLACE, PFC, USMCR,
Petitioner,

v.

John H. CHAFEE, Secretary of the Navy,
Leonard F. Chapman, Lt. Gen., USMC,
Commandant of the Marine Corps, Richard B. Newport, Col., USMC, Director
12th Marine Corps Dist., Robert E. King,
Lt. Col., USMCR, Commanding Officer,
4th Tank Bn., Respondents.

Civ. No. 70-215-T.

United States District Court,
S. D. California.

March 17, 1971.

Earle A. Partington, San Francisco,
Cal., for petitioner.

Harry D. Steward, U. S. Atty., Raymond F. Zvetina, Asst. U. S. Atty., San
Diego, Cal., for respondents.

MEMORANDUM OF DECISION

TURRENTINE, District Judge.

This is a military habeas corpus action brought by an enlisted man in the U. S. Marine Corps Reserve seeking relief from the sentence of a summary court-martial on the ground that it lacked jurisdiction. The court has considered the pleadings, affidavits and memoranda on file as well as evidence and oral argument adduced at an evidentiary hearing. This memorandum of decision embodies findings of fact and conclusions of law.

The facts of the case are undisputed. Petitioner enlisted in the Marine Corps Reserve for six years on January 9, 1967. During the enlistment proceedings and shortly prior to taking the oath of enlistment, petitioner was presented with written orders assigning him to Class II, inactive duty for training with the Fourth Tank Battalion, Force Troops, Fleet Marine Force. These orders recited that upon petitioner's voluntary acceptance of the orders he would be required to perform forty-eight regular drills and not more than seventeen days of active duty for training each year. The orders further specified that during these periods of training duty petitioner would be subject to the Uniform Code of Military Justice [1] (hereinafter "Uniform Code"). Petitioner executed a written endorsement to the orders stating that he voluntarily accepted them.

Petitioner's reserve service proceeded uneventfully for several years, but in early 1970 he was charged with willfully disobeying an order of his superior commissioned officer to get a haircut, a violation of Article 90 of the Uniform Code, 10 U.S.C. § 890. He rejected nonjudicial punishment under Article 15 of the Uniform Code and was subsequently convicted of the offense by a summary court-martial. He was sentenced to be confined at hard labor for twenty-one days, to forfeit $60.00 pay per month for one month, and to be reduced to the grade of private, E–1. Execution of this sentence was deferred pursuant to Article 57 of the Uniform Code, 10 U.S.C. § 857.

Jurisdiction of the summary court-martial over petitioner is predicated on Article 2(3) of the Uniform Code which reads as follows:

"Art. 2. Persons Subject to this Chapter. The following persons are subject to this chapter:

\* \* \* \* \* \*

(3) Members of a reserve component while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to this chapter."

Petitioner's threefold challenge to the jurisdiction of the court-martial centers on the requirements of this statute. He first asserts that the orders subjecting him to the Uniform Code are invalid because they were issued prior to the oath of enlistment when he was, in fact, a civilian. This claim is without merit. An enlistment proceeding requires the execution of various documents denoting the acceptance of certain rights and liabilities, but the process is essentially one integrated transaction. Petitioner may not have been a marine before taking the oath, but the volitional act of accepting these orders survives until the administration of the oath accomplishes the complete change of status.

Petitioner next asserts that jurisdiction over inactive duty reserve personnel is limited to situations involving the use of dangerous and expensive equipment. During the hearings on the Uniform Code, there was commentary from individual congressmen and witnesses to the effect that court-martial jurisdiction over inactive duty reservists would be exercised by the military only in situations involving the use of dangerous and expensive equipment.

[1]. 10 U.S.C. § 801 et seq.

However, the statute clearly imposes only three conditions for the exercise of court-martial jurisdiction over inactive duty reservists: (1) authorization by written order; (2) voluntary acceptance by the reservists; and (3) the orders must specify that the reservist is subject to the Uniform Code. The precise and comprehensive formulation of the statute leaves no room for additional conditions not expressed by Congress.[2] Where statutory provisions are clear and unambiguous on their face, there is no warrant for consulting the legislative history. United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); United States v. McKesson & Robbins, 351 U.S. 305, 315, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). If Congress had desired to further restrict court-martial jurisdiction it could have done so with a few strokes of the pen. The most that can be said of the remarks about dangerous and expensive equipment is that they illustrated situations where that jurisdiction was thought to be necessary.[3]

The most substantial question posed is whether the military may, by a single "blanket" order issued at the time of enlistment, extend court-martial jurisdiction to cover all inactive duty training periods during the enlistment. Petitioner argues that this order, which in effect eliminates any choice beyond the day of enlistment, is incompatible with the requirement that the orders be voluntarily accepted. The statute itself prescribes no time for issuing such orders, nor does it limit the duration of an order. At the outset, however, it appears that any element of choice is reduced to its minimum dimensions by the procedure followed in this case. The danger to voluntariness is that in the middle of a sea of forms the young man entering the service is signing away certain fundamental rights of civilian criminal justice. The validity of a waiver of these rights should be measured by no less a standard than that of an "intentional relinquishment or abandonment of a known right or privilege" set forth in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

That the concept of a knowing submission to court-martial discipline was intended by Congress is confirmed by a

---

2. There is little material about jurisdiction over inactive duty training in the cases. In the case of In Re La Plata's Petition, 174 F.Supp. 884 (D.C.1959), it was held that a Marine reservist who failed to report as ordered for 45 days of active duty was subject to the Uniform Code. The court found that Article 2(3), did not apply to the situation but stated in regard to that section:

> "The legislative history reveals that Congress intended that subsection 3 apply to inactive reservists who merely attended short periodic drills or training, participated in week-end flights or who handled dangerous or expensive equipment." Id. at 886.

The military case of United States v. Schuering, 39 CMR 480 (1966) involved the court-martial of an inactive duty reservist assigned to a motor transport maintenance unit. It was held that special orders directing the accused to report for temporary active duty for one day for his court-martial were insufficient to bring him under military law at the time of trial. In listing the statutory requirements of Article 2(3), the court made no mention of dangerous and expensive equipment. Id. at 482.

3. The senate report contains the following statement about this section:

> "Subdivision 3, article 2, was objected to by Reserve associations on the ground that it would be used to subject Reserves to the code when they are engaged in all types of inactive duty training. Although the committee has made no change in this subdivision, it desires to express the view that military departments *should* issue orders subjecting Reserves to the code only when they are engaged in inactive duty training involving the use of dangerous or expensive equipment." (Emphasis supplied.) S.Rept. 486 on H.R. 4080, 81st Cong. 1st Sess., at 4–5, June 10, 1949.

Petitioner is a member of a tank battalion and possesses the military occupational specialty of 1811, tank crewman. If there were a jurisdictional requirement of dangerous and expensive equipment, a tank would surely fall within that category.

consideration of the background and history of the legislation. The Uniform Code of Military Justice is a comprehensive penal statute which was designed to modernize military law and to bring all the military services under one body of substantive and procedural law for the purposes of military discipline. It supplanted the former Articles of War, the Articles for the Government of the Navy, and the Disciplinary Laws of the Coast Guard. The final enactment was the product of numerous military and civilian committees which had studied the problems of military justice since the end of World War II. The bill presented to Congress had been drafted by a Defense Department Committee appointed by Secretary Forrestal and chaired by Professor Edmund Morgan, Jr.

It appears that prior to enactment of the Uniform Code, the Navy and Marine Corps possessed the most extensive jurisdiction over inactive duty reservists under the Articles for the Government of the Navy, formerly codified in 34 U. S.C. § 855. This statute afforded court-martial jurisdiction when reservists were performing training duty with or without pay, including periods of instruction, during travel to or from such duty, and whenever the reservist was wearing his uniform. The Army, however, never possessed court-martial jurisdiction over its inactive-duty reservists under the Articles of War. During the hearings on the Uniform Code in 1949–1950, associations of reservists vocally opposed such an extensive grant of jurisdiction over inactive duty reservists as the Navy had possessed until that time. The provisions of Article 2(3) represented a compromise between the positions of the respective military services. One commentator described the proposed statute in these terms:

"Now, this is a substantial dilution of the Navy's jurisdiction, and in the

same breath is granting jurisdiction to the Army that they never have had before."[4]

This diminution of the Navy's former jurisdiction was brought about by strong objections from reservists who were alarmed that their voluntary part-time services to the country would strip them of substantial rights of a civilian person accused of a crime and tried in civilian courts.[5] It was thought that the capability of the reserves might be degraded by difficulty in recruiting men to look down the barrel of military law.

The statutory response to these concerns took two forms. First, the reservist received notice in his orders that he was subject to the Uniform Code; and secondly, he had an option to decline to submit to court-martial jurisdiction. That this option to decline was meant to continue during the course of service is suggested by an exchange which occurred during Senate hearings on the bill between Mr. Felix Larkin, chairman of a working group in Professor Morgan's committee, and Senator Saltonstall:

"SENATOR SALTONSTALL. In my interpretation in the case that I put the hypothetical question, of a man coming out of his house and having an assault committed—committing an assault, or something, on a private street, and so on, would not under your interpretation come within this meaning of this act?

MR. LARKIN. If I can add several facts to it, I may be able to elaborate what was the intended meaning of this. It was intended then to cover persons on this inactive-duty training over the weekends, principally Reserves who come in and are using heavy expensive equipment, such as aircraft and ships, and things of that character, and not to cover the other

4. Testimony of Mr. Felix Larkin, in Hearings on S. 857 and HR 4080 before a Subcomm. of the Senate Armed Services Committee, 81st Cong., 1st Sess., at 328 (1949).

5. See, e. g., testimony of Col. John P. Oliver, Hearings on HR 2498 Before a Subcomm. of the House Committee on Armed Services, 81st Cong., 1st Sess., at 740 (1949).

incidentals, and to assure that it was done on a voluntary basis, and to assure these Reservists that they would understand what they were doing, because they cannot be called in mandatorily in that fashion, these provisions were set forth that they be given written orders specifically calling them, which they voluntarily accept, and which are set forth in such a way that they become subject to the articles.

If they do not desire to do so, why, of course, they do not come in. They have this notice."[6]

And later during the hearings Mr. Larkin made a similar observation:

"Now we have tried in the House hearings and in the commentary that we wrote to this bill to make it perfectly clear that the legislative intent of this provision is not to apply when they wear uniforms and when they go to monthly meetings, but it is only to cover the week-end flight duty, and other sea duty on shipboard, when the man has appropriate notice that he is subject to it, when he voluntarily accepts it, and under no other circumstances.

Now, they do not cut orders of that kind, and give them those written orders when they come to those monthly meetings, and when they go to parades."[7]

█ This material suggests not only that the individual reservist is to retain a choice as to his status vis a vis military justice, but also that a corresponding reevaluation would be carried out by the military. The discussion of dangerous and expensive equipment, while it did not result in a jurisdictional limitation, indicated a Congressional desire that the application of military justice not be automatic. In any event, insofar as an individual is concerned, the military may not, by inducing a "waiver" of objection to court-martial jurisdiction at the time of enlistment, impose that jurisdiction for the balance of the enlistment of an inactive duty reservist.

█ The government argues that if orders were required to be issued and "voluntarily accepted" prior to each reserve drill or meeting, this would entail a mindless profusion of paperwork and add a considerable measure of uncertainty to the planning of reserve training. The answer to this is that the military may issue an order subjecting the recipient to military justice over a considerable period of time, even extending to an entire period of enlistment. Such orders, however, must at least put the reservist on notice in clear language that he is free to revoke his consent to court-martial jurisdiction by notifying his commanding officer of this decision prior to a scheduled drill. If it is sufficiently important to the reserve unit that the drill in question be accompanied by court-martial jurisdiction, then a revoking reservist can be marked down for unsatisfactory participation for that drill. Repeated unsatisfactory participation can be dealt with by sanctions such as administrative reduction in rank, discharge, or by use of the statutory authority for involuntary recall to active duty.[8] If in the judgment of the military court-martial jurisdiction is necessary, then it may be applied to those whose acceptance is voluntary with a minimum of confusion. If court-martial jurisdiction is not necessary to certain inactive duty training, then it should not be utilized.[9]

"There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution. Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service."

6. Hearings on S. 851 and H.R. 4080 Before a Subcomm. of the Senate Armed Services Committee. 81st Cong., 1st Sess. at 155 (1949).

7. *Id.* at 329.

8. 10 U.S.C. § 270.

9. See Toth v. Quarles, 350 U.S. 11, 22–23, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955), where the court stated:

It follows that the orders in question were not "voluntarily accepted" and that the summary court-martial lacked jurisdiction to try the accused. Judgment will be entered accordingly.

Recent amendments to the Uniform Code increasing the availability of lawyer counsel, creating military judges and diminishing command influence have reduced many differences between civilian and military courts, but the military court-martial remains a different creature from a civilian jury. A meaningful agreement to submit to court-martial discipline cannot be inferred from the record in this case.