James M. **WALLACE**, PFC., USMCR, Appellee,

v.

John H. **CHAFEE**, Secretary of the Navy, et al., Appellants.

No. 71-1804.

United States Court of Appeals, Ninth Circuit.

Dec. 15, 1971.

Rehearing Denied Jan. 20, 1972.

Raymond F. Zvetina, Asst. U. S. Atty. Chief, Civ. Div. (argued), Harry D. Steward, U. S. Atty., San Diego, Cal., for appellants.

Earle A. Partington (argued), San Francisco, Cal., for appellee.

Before HAMLEY and KILKENNY, Circuit Judges, and BYRNE, District Judge *.

HAMLEY, Circuit Judge:

The United States appeals from an order of the district court (reported at 323 F.Supp. 902) granting a writ of habeas corpus to James M. Wallace, a member of the U. S. Marine Corps Reserve, following Wallace's court-martial conviction for disobeying a military order to get a haircut. The district court granted habeas relief on the ground that the court-martial lacked jurisdiction. We hold the court-martial had jurisdiction, and reverse.

Wallace voluntarily enlisted in the Fourth Tank Battalion, U. S. Marine Corps Reserve, on January 9, 1967, for a term of six years. The enlistment contract obligated him for six months active duty for training (which was completed in 1968), and for five-and-one-half years of inactive duty training assemblies and two weeks of active duty summer training per year.

At the time of his enlistment on January 9, 1967, immediately prior to taking the enlistment oath and signing the enlistment contract, Wallace acknowledged in writing the acceptance of orders which required him to perform the annual training described above, and which stated:

"During the actual performance of regular drills, periods of equivalent instruction or duty, and annual training duty pursuant to this order, you are subject to the Uniform Code of Military Justice. Upon acceptance by you of these orders you will be subject to the code during periods of inactive duty training performed which are the same or an interrupted continuation of the training contemplated by these orders."

The acceptance of these orders, tendered to Wallace pursuant to 32 C.F.R. § 713.607, was a precondition of enlistment. Wallace was given no information concerning the Uniform Code of Military Justice (UCMJ) prior to his acceptance of the orders and enlistment.

Thereafter, in 1970, Wallace was convicted by summary court-martial of violation of Article 90, UCMJ, 10 U.S.C. §

* The Honorable William M. Byrne, Jr., United States District Judge for the Central District of California, sitting by designation.

890, *i. e.*, wilful disobedience of the orders of a superior commissioned officer (to get a haircut). Both the offense and the court-martial trial took place during regularly scheduled inactive duty training (drill) periods of Wallace's reserve unit. The drill during which the offense occurred involved classroom training only and not the use of any equipment. However, the battalion's equipment, consisting of twenty-five tanks and assorted other vehicles was available for use at the drill assembly.

Jurisdiction of the court-martial was asserted under Article 2(3), UCMJ, 10 U.S.C. § 802(3), which makes subject to the UCMJ:

> "Members of a reserve component while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to . . . [the UCMJ]."

On conviction, Wallace was sentenced to hard labor for twenty-one days, the forfeiture of sixty dollars and reduction in grade to Private. The sentence was deferred pending the outcome of this habeas corpus proceeding.

In granting habeas relief, the district court held that the "voluntary" acceptance of written orders which specify that they are subject to the UCMJ, as required by Article 2(3), is not fulfilled by the mere acceptance of a single "blanket" order.

The court observed that in accepting court-martial jurisdiction, a reservist is signing away certain fundamental rights of civilian criminal justice. Citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), the district court stated that rights of this kind can only be waived under circumstances indicating an "intentional relinquishment or abandonment of a known right or privilege." The acceptance of a "blanket" order of the kind which was presented to Wallace does not meet this test, the court held, because it is presented to the incoming reservist in a "sea of forms," and because such a procedure would reduce any element of choice "to its minimum dimensions."

The district court stated that a consideration of the background and history of the legislation provides confirmation that Congress intended that the reservists' submission to court-martial jurisdiction be a knowing submission. After reviewing this background and history the district court concluded that it was intended not only that the individual reservist is to retain a choice as to his status vis-à-vis military justice, but also that a corresponding reëvaluation would be carried out by the military. Based on this premise the court reasoned that while, as occurred here, the military may issue an order subjecting the recipient to military justice over an entire period of enlistment:

> "Such orders, however, must at least put the reservist on notice in clear language that he is free to revoke his consent to court-martial jurisdiction by notifying his commanding officer of this decision prior to a scheduled drill. If it is sufficiently important to the reserve unit that the drill in question be accompanied by court-martial jurisdiction, then a revoking reservist can be marked down for unsatisfactory participation for that drill. Repeated unsatisfactory participation can be dealt with by sanctions such as administrative reduction in rank, discharge, or by use of the statutory authority for involuntary recall to active duty [under 10 U.S.C. § 270]."

It may be questioned at the outset whether "voluntariness" would be achieved by such a procedure. It would seem that a reservist would not have a "voluntary" right to "revoke" his prior consent to court-martial jurisdiction, if such revocation will subject him to the described administrative sanctions. Likewise, it would appear that this suggested procedure, entitling the reservist to notify his commanding officer of the reservist's decision to "revoke" his prior consent with respect to a particular drill, followed by individual "reevalua-

tions" by the military in response to such notices would bog down the military in a mass of paper work.

But, more fundamentally, we cannot agree that the rule announced in Johnson v. Zerbst has application here, or that the background and history of the legislation confirms the district court's construction of Article 2(3).

It is true that Johnson v. Zerbst stands for the proposition that certain fundamental legal rights can be waived only by the standard there set forth; further, it is true that the Supreme Court has viewed, and continues to view, the right to a civilian trial with all its safeguards, rather than a military court-martial, as a fundamental legal right. O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); United States ex rel. Toth v. Quarles, 350 U.S. 11, 22–23, 76 S.Ct. 1, 100 L.Ed. 8 (1955). Moreover, of the twelve jurisdictional provisions in UCMJ Article 2 (10 U.S.C. § 802), Article 2(3) is the only one which makes UCMJ jurisdiction dependent upon voluntary submission. This seems to indicate that Congress may have desired a truly voluntary acceptance.

■ Despite these considerations, however, we do not think that the standard enunciated in *Johnson* should apply. That case was one concerning the right of a criminal defendant to assistance of counsel. The criminal defendant has the court proceeding thrust upon him. The proceeding will take place whether he waives his right to counsel or not; therefore, because his participation in the trial is not voluntary, the waiver of a fundamental right which he has as part of that hearing must be governed by the standards of *Johnson*.

■ By contrast, the enlistee in the reserves is entering a purely voluntary relationship. He need not join, although

it is true that if he does not, he may be subject to the draft. His entry into the armed forces is, in this case, a purely volitional act; and if he accepts the Article 2(3) orders only as part of the contractual transaction of enlistment (as Wallace did here) there is not as great need for the safeguards contained in the *Johnson* standard. Instead, it seems to us that it should be sufficient if the contract law standards of notice and volitional act are met. One who enters a contract is on notice of the provisions of the contract. If he assents voluntarily to those provisions after notice, he should be presumed, in the absence of ambiguity, to have understood and agreed to comply with the provisions as written. This is hornbook contract law.

■ In the present case, the orders which Wallace accepted and endorsed by signature meet the requirements set forth above. The orders are not in unnecessarily small print. The requirement that they must be voluntarily accepted is clearly stated, and repeated in the endorsement which Wallace signed. They also state clearly that he is subject to the UCMJ. While Wallace received no prior training or orientation in UCMJ, he did not assert that he was unaware of the Code's effect. But even if he was unaware of this, under the notice standards applicable to this volitional contract setting, he should have inquired as to the meaning of the UCMJ. It does not appear that he did so, and he therefore must be presumed to have understood the meaning of the document which he signed.

Turning to the background and legislative history of Article 2(3), there appears to be no indication that Congress contemplated that reservists would manifest their voluntary choice by deciding whether, with respect to a particular drill, to revoke prior acceptance of the UCMJ.[1] One view expressed in the

---

1. See Hearings before a Subcommmittee of the Committee on Armed Services, House of Representatives, on H.R. 2498, 81st Cong., 1st Sess. (1949); Hearings before a Subcommittee of the Committee on Armed Services, U.S. Senate, on S. 857 and H.R. 4080, 81st Cong., 1st Sess. (1949); H.R.Rep.No.491, 81st Cong., 1st Sess. (1949); S.Rep.No.486, 81st Cong., 1st Sess. (1949). The complete

House hearings was that reservists would exercise their choice in this regard by attending, or not attending, drills. But, as noted above, the possible administrative sanctions for such a refusal deprive this kind of choice of any real quality of voluntariness.

The explanation as to why, at the time of the Congressional hearings, this kind of choice was thought, at least by some, to evidence "voluntary" action probably lies in the fact that, at that time, all reserve participation was purely voluntary. In those days the practice was to cut special orders for the infrequent formal aircraft or sea duty. There was no administrative sanction for failure to participate in any formal or informal activity. Thus a choice to attend was voluntary in the sense that there was no penalty for failing to do so.

Under today's practice the enlistee in the reserves obligates himself to serve an active duty period, followed by inactive duty drills. Once he has enlisted, he cannot withdraw unilaterally and become a civilian again. Enlistment is a contract; but it is a contract which changes the status. Like marriage, in which neither husband nor wife can unilaterally withdraw after entering the relationship, the enlistment changes the status of the civilian to soldier until released. In re Grimley, 137 U.S. 147, 151–152, 11 S.Ct. 54, 34 L.Ed. 636 (1890); Cf. United States v. Union Pacific R. R. Co., 249 U.S. 354, 39 S.Ct. 294, 63 L.Ed. 643 (1919).

Consequently, under present conditions, the last stage at which the enlistee is really free to accept or reject UCMJ jurisdiction is at the time of enlistment. At that point, if he rejects submission to the UCMJ he can simply walk out of the recruiting office.

If, then, the time of enlistment is the last point at which the enlistee preserves actual freedom of choice, it is the logical and proper time to ask him for his voluntary acceptance of orders which submit him to UCMJ jurisdiction. The district court reasoned correctly that there is no provision in the statute limiting the duration of orders issued under Article 2(3); and, contrary to the court's reasoning, there is no indication in either the statute or legislative history (nor in Johnson v. Zerbst) that voluntariness requires the reservation of a right to revoke acceptance once made. In fact, characterization of the enlistment process, including acceptance of the orders as the making of a status-changing contract compels the conclusion that revocation after acceptance should not be allowed.

■ To summarize, no requirement that the reservist be given power to revoke his acceptance after making it is indicated in the statute or history, and in fact the imposition of such a requirement would be of little use because the reservist would be subject to severe sanctions if he chose to revoke. Rather, the acceptance of the order is best made at the time of enlistment, while the enlistee retains a fully voluntary status vis-à-vis military service; the acceptance of the order may be viewed as part of the enlistment contract because it is a precondition to enlistment. If properly accepted then, it remains valid for the duration stated on its face.

It follows that the district court order cannot be sustained on the ground relied upon by that court. However, Wallace also argues that the grant of habeas relief should in any event be sustained upon other grounds which he urged in the district court.

Wallace contended in the district court that because he signed the order subjecting him to the UCMJ before taking the enlistment oath, he did not have the requisite military status to accept any orders, but was rather a civilian who could not accept such orders, and that the acceptance was therefore invalid. In support of this view, Wallace cited In re Grimley, 137 U.S. 147, 156–157, 11 S.Ct.

text of these materials is set out in Index and Legislative History, Uniform

Code of Military Justice (Gov. Printing Office, 1950).

54, 34 L.Ed. 636 (1890). The district court rejected this contention, stating that the whole document-signing process of January 9, 1967, was a single transaction, and that the volitional act of acceptance survived until after the change of status from civilian to military was complete.

It is true that, in *In re* Grimley, the Supreme Court said: " . . . the taking of the oath of allegiance is the pivotal fact which changes the status from that of civilian to that of soldier; . . . ." 137 U.S. at 156–157, 11 S.Ct. at 56. Moreover, the Supreme Court has apparently adhered to a rather rigid conceptual definition concerning the formalities of change of status from civilian to military. *Cf*. United States v. Union Pacific R. R. Co., 249 U.S. 354, 359, 39 S.Ct. 294, 63 L.Ed. 643 (1919); and United States ex rel. Hirshberg v. Cooke, 336 U.S. 210, 69 S.Ct. 530, 93 L. Ed. 621 (1949), where the Court held that the issuance of an honorable discharge, followed by a hiatus of a single day during which the petitioner enjoyed civilian status before reënlistment, acted to defeat court-martial jurisdiction for offenses committed during the prior enlistment.

However, both *Grimley* and *Union Pacific* concerned the time of attachment of automatic obligations dependent on the change in status, while the present case involves the question of whether or not an obligation can be voluntarily accepted before the enlistment contract is signed and the oath taken. Further, while in *Hirshberg* the petitioner had voluntarily signed a paper submitting himself to Navy regulations which purported to subject him to court-martial jurisdiction for offenses committed during prior enlistments, the Court in *Hirshberg* held that the regulations themselves were invalid and beyond the Navy's power to promulgate. 336 U.S. at 218, 69 S.Ct. 530. In the present case we have already concluded that the order which Wallace accepted was valid and within the Marine Corps' power to issue; and nothing in *Hirshberg* indicates that such a valid order could not be validly accepted prior to taking the enlistment oath.

In our opinion, such an order may be validly accepted prior to taking the oath and signing the enlistment contract. The facts that it was so drawn as to be applicable only if voluntarily accepted, and that its acceptance was a precondition to enlistment, make it a part of the enlistment contract. As to the time of acceptance, the Supreme Court has said:

> "It is well-settled law that several writings executed between the same parties substantially at the same time and relating to the same subject-matter may be read together as forming parts of one transaction, nor is it necessary that the instruments should in terms refer to one another if in point of fact they are parts of a single transaction."

Bailey v. Hannibal & St. Joseph Railroad Co., 84 U.S. (17 Wall.) 96, 108, 21 L.Ed. 611. *Cf*. Peerless Casualty Co. v. Housing Authority of Hazelhurst, 228 F.2d 376, 381 (5th Cir. 1955).

Moreover, having the enlistee accept or reject the order before actually taking the enlistment oath, when done as part of the same transaction, seems an eminently sensible way to proceed. In today's context of the obligated reservist, the only time at which both the reservist and the military occupy a completely voluntary relationship is before the enlistment oath. At that stage, the reservist still has the option to refuse such orders, and the armed forces may still refuse to accept the applicant for service if he does exercise his option to refuse. By contrast, once the oath has been administered, either the reservist must be forced to accept the orders, or the military must forego UCMJ control which it desired to have.

We accordingly hold that the procedure by which Wallace accepted the orders prior to the oath was not forbidden by the doctrine of *Grimley* or *Hirshberg*, but rather was permissible under the

*Bailey* case. In addition, it is our view that, from a practical standpoint, it was preferable to any other procedure.

Wallace also renews here the argument he made in the district court, based on legislative history, that under Article 2(3), UCMJ applies only when the reservist is actually using dangerous or expensive equipment.

Article 2(3) contains no such limitation and we therefore do not deem it appropriate to search the legislative history on this matter. *See* United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); United States v. McKesson & Robbins, 351 U.S. 305, 315, 76 S.Ct. 937, 100 L.Ed. 1209 (1956). Moreover, even if this contention by Wallace concerning construction of the statute were correct, it would still not help him. He was a specialist, a tank crewman, and tanks were available at the drills in question. Wallace cannot seriously contend, although he makes the point, that he would be subject to UCMJ only when actually mounted on his tank, but not during other parts of the same drill, or at a drill when tanks were available but not used.

■ Wallace also contends that the orders subjecting him to UCMJ were insufficient, and should have contained express language as to the times and places at which he came under military jurisdiction. However, both the United States and the district court state correctly that the statute prescribes no time for issuing such orders, nor does it limit the duration of such an order. Furthermore, as discussed above, the advance issuance of such blanket orders is, in today's obligated reserve context, the only practicable way to preserve freedom of choice and voluntariness on the part of the enlistee. The reasons are the same as those we have stated for disagreeing with the district court's conclusion that the petitioner should have been given the right to revoke the acceptance once made.

■ Finally, Wallace contends that if Article 2(3) is construed as applicable to all reservists at all inactive duty reserve drills once they have voluntarily accepted orders under the article, as we have concluded it is in this case, then the article itself is unconstitutional. He argues that if the statute contemplates such an extension of military jurisdiction, then it must be struck down under the principle that the jurisdiction of military courts-martial is to be construed as narrowly as possible, citing Ex parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866); Givens v. Zerbst, 255 U.S. 11, 19, 41 S.Ct. 227, 65 L.Ed. 475 (1921); Duncan v. Kahanamoku, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946); United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L. Ed. 8 (1955); Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); Kinsella v. United States ex rel. Singleton, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed. 2d 268 (1960); Grisham v. Hagan, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); and McElroy v. United States ex rel. Guagliardo, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960).

Neither the Government nor the district court spoke to the possibility that Article 2(3), as we have construed it, might be unconstitutional. However, we believe Wallace's contention is unsound. All of the cases cited by Wallace have to do with civilians or with discharged servicemen whose connection with the military had ended. By contrast, it is fair to say that the inactive duty reservist, at least when on duty, is a soldier rather than a civilian. There are some statements to the contrary in the Senate and House hearings, but they were all made in the heat of argument over Article 2(3) by those opposing the provision, and are all conclusory statements unsupported by reasoning.[2]

---

2. For almost a century prior to the UCMJ the statute governing the Navy extended such jurisdiction over reservists whenever they so much as wore their uniforms. *See* Act of June 25, 1938, Ch. 690, § 301, 52 Stat. 1180. The constitutionality of the Navy statute was never questioned.

The principle that court-martial jurisdiction should be narrowly construed on constitutional grounds still stands; our conclusion is that the use of such jurisdiction over on-duty reservists comports with such a construction. Article 2(3) purports to extend only to on-duty periods, and we therefore think it is valid.

Reversed.