Martin CAPUTO, 059 50 0267, Ship's Storekeeper Third Class (E–4), U.S. Naval Reserve, Ready, Petitioner,

v.

**UNITED STATES, Respondent.**

**Miscellaneous Docket No. 83–08.**

U.S. Navy-Marine Corps Court of Military Review.

29 Feb. 1984.

Marshall G. Kaplan, Attorney for Petitioner.

CDR David C. Larson, JAGC, USN, Appellate Defense Counsel.

LCDR David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LCDR D.L. Kelly, JAGC, USN, Appellate Government Counsel.

LCDR R. Clayton Seaman, Jr., JAGC, USN, Appellate Government Counsel.

## OPINION

GARVIN, Judge:

This case comes to the Court in the form of a Petition for Extraordinary Relief seeking to dismiss the charges on a jurisdictional basis.

On 27 May 1983 appellant appeared at a special court-martial convened at the Naval Station, Philadelphia, Pennsylvania pursuant to special court-martial convening order 83–2, Commander, Naval Reserve Readiness Command, Region Two, Scotia, New York. He appeared in civilian clothes. He was represented by his retained civilian counsel, and his detailed military counsel. At arraignment, appellant raised a motion to dismiss for lack of jurisdiction over the person, and a second motion to dismiss for

lack of jurisdiction over the offenses alleged.

Ship's Storekeeper Third Class (SK3) Caputo, U.S. Naval Reserve, Ready (USNR–R) was charged with wrongfully and knowingly possessing two hundred "microdot" doses of lysergic acid diethylamide (LSD) with the intent to distribute in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 and with an unauthorized absence in violation of Article 86, UCMJ, 10 U.S.C. § 886. The drug offense allegedly occurred at Waikiki Beach, Honolulu, Hawaii on 13 February 1983, and the unauthorized absence was alleged to be from Naval Reserve Cargo Handling Battalion Six, Detachment "A" (NR CHB SIX, DET "A"), while appellant was on active duty at the Naval Supply Center, Pearl Harbor, Hawaii.

The facts are not disputed for the purpose of deciding the jurisdictional issues. We adopt Judge Haldeman's findings of fact:

FINDINGS OF FACT. The following chronology and findings of fact are pertinent to both motions by the defense:

1. On 13 June 1982, at the Naval Reserve Center, Staten Island, New York, Martin Caputo enlisted in the United States Naval Reserve, Ready, in pay grade E–4, for a period of two years. Appellate Exhibit (after this, AE) V.

2. On 13 June 1982, SK3 Caputo requested assignment, and was assigned pursuant to his request, to NR CHB SIX, DET "A", Naval Reserve Center, Fort Wadsworth, Staten Island, New York. AE's VI, VII, and VIII.

3. On 13 June 1982, SK3 Caputo voluntarily acknowledged that he accepted the above assignment "... fully understanding that while engaged in training pursuant thereto I shall be subject to the provisions of the Uniform Code of Military Justice." AE VIII. (The military judge inferred voluntariness from the properly executed form containing the signature of SK3 Caputo; furthermore, the defense, in argument and presentation of the motion, made no claim of lack of understanding or involuntariness.)

4. Subsequent to 13 June 1982, SK3 Caputo regularly attended most of his scheduled inactive duty training drills and received pay for his attendance. Testimony of SK3 CAPUTO.

5. On 7 February 1983, pursuant to his contractual duty to perform 14 days active duty for training (ACDUTRA) annually, and in accordance with orders from the Chief of Naval Reserve, SK3 Caputo reported, with other members from his unit, to the Commanding Officer, Naval Supply Center, Pearl Harbor, Hawaii, for ACDUTRA. AE's VIII and IX.

6. On 13 February 1983, SK3 Caputo was apprehended by a plain-clothes member of the Honolulu Police Department for drinking in public in the vicinity of the Kuhio Beach Center on Kalakaua Avenue, a location not on any military base or reservation. Attachment 1 to AE XI.

7. At the same place and time, the arresting police officer conducted a "search incident to arrest" and discovered a black film cannister from which were protruding ... three clear plastic bags containing purple pellets in the left front pocket of SK3 Caputo's white sport coat. Attachment 1 to AE XI.

8. As a result of his arrest, SK3 Caputo was held in civilian custody from approximately 2145, 13 February 1983 to sometime on 15 February 1983. Attachment 1 to AE's XI, and XV.

9. On and after 13 February 1983, authorities of SK3 Caputo's reserve drilling unit, then in Hawaii, and authorities at his parent reserve unit in Staten Island, New York, were aware that he had been arrested for "drinking in public" and "promoting dangerous drugs" and held by civilian authorities. AE's XI and XV.

10. On 18 February 1983, SK3 Caputo returned to his parent reserve command, detached from ACDUTRA and returned home. AE's IX and XV.

11. Between 17 February 1983 and 2 March 1983, SK3 Caputo's Naval Reserve chain of command became sufficiently

aware of the details of his involvement with civilian authorities to evaluate possible prosecution for the alleged offenses. (Inference based on the date of preparation of charges and the date of the request for Naval Investigative Service (NIS) assistance.)

12. On 2 and 3 March 1983, charges against SK3 Caputo, alleging possession of LSD with intent to distribute in violation of Article 134, UCMJ, and alleging unauthorized absence in violation of Article 86, UCMJ, were prepared and sworn at the Naval Reserve Center, Staten Island, New York. Charge sheet pp. 1 and 3.

13. On 10 March 1983, Commander, Naval Reserve Readiness Command (COMNAVRESREDCOM), Region TWO, prepared a letter to the Military Magistrate, Naval Base, Philadelphia, justifying planned pre-trial confinement of SK3 Caputo. AE X(d).

14. On 12 March 1983, SK3 Caputo reported for regularly scheduled inactive training duty with NR CHB SIX. AE's X(a), (b), (c), (d) and XIII; testimony of SK3 Caputo.

15. Immediately after reporting on 12 March 1983, SK3 Caputo was advised of the charges against him, was administered warnings required by Article 31, UCMJ, 10 U.S.C. § 831, and *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), and was ordered into pre-trial confinement. AE X(a), (b), (c).

16. On 12 March 1983, the Commanding Officer, NR CHB SIX, by letter, extended, for an indefinite period of time, SK3 Caputo's inactive training duty status, and ordered him to report to COMNAVRESREDCOM, Region TWO. AE X(a).

17. On 14 March 1983, SK3 Caputo was released from pre-trial confinement. AE X(c).

18. On 14 March 1983, civil authorities in Honolulu determined they would not prosecute SK3 Caputo for the alleged "drinking in public" or the alleged "promoting dangerous drugs". AE XI.

19. On 14 March 1983, the NIS obtained from the Honolulu Police Department official reports concerning the Caputo arrest and investigation which had been previously withheld. AE XI.

20. On 24 March 1983, SK3 Caputo, through his detailed military defense counsel, protested the extension of his inactive duty training status. AE IV.

21. From 12 March 1983 to the present, the convening authority regards SK3 Caputo as being in an inactive duty training status, amenable to court-martial under the authority of "MILPERSMAN,[1] Article 3420320(6)(b)". AE's X(a) and XIII.

22. From 13 June 1982 to the present, SK3 Caputo has not been discharged or separated from the United States Navy and has continuously been a member of the United States Naval Reserve, Ready. AE's V, VI, VII, VIII, IX, X, XIII, XIV; testimony of SK3 CAPUTO.

The jurisdictional issue was vigorously argued and briefed at the initial hearing. On 1 June 1983, Judge Haldeman, based on the foregoing facts, rendered a memorandum decision denying the motion. Thereafter, Judge Haldeman was detached from his judicial duties and executed his permanent change of station orders. Judge Edington was then substituted as trial judge. He entertained a defense request to reargue the motion. His memorandum decision of 25 July 1983 denied the motion to reargue and affirmed the trial court's determination that trial could proceed.

## PART A

We have carefully examined the record, the written briefs, and the 17 November 1983, oral arguments of counsel. The issue presented by counsel is:

MAY THE UNITED STATES NAVY COURT–MARTIAL A NAVAL READY RESERVIST, IN AN INACTIVE DUTY FOR TRAINING STATUS, ON CHARGES WHICH ALLEGEDLY OCCURRED WHILE THE PERSON WAS

---

1. Naval Military Personnel Manual.

PREVIOUSLY PERFORMING ACTIVE DUTY FOR TRAINING?

We respond affirmatively.

SK3 Caputo was, at the time the offenses were committed, on active duty for training pursuant to written orders voluntarily accepted by him which specified that he was amenable to the UCMJ during that period. These facts are established by the evidence of record. The leading military decision and the landmark civilian decision have recognized jurisdiction in similar circumstances. *United States v. Schuering*, 16 U.S.C. M.A. 324, 36 C.M.R. 480 (1966); *Wallace v. Chafee*, 451 F.2d 1374 (9 Cir.1971).

SK3 Caputo's acceptance of his assignment to a ready reserve billet which authorized the receipt of pay for his reserve participation was a precondition to his enlistment in the Naval Reserve. *Wallace v. Chafee, supra.* His acceptance of the billet, on the condition that he would be subject to the UCMJ while performing training duty, conferred jurisdiction in his superiors, who were authorized to act pursuant to the UCMJ. SK3 Caputo's voluntary acceptance of a change of status from civilian to part-time sailor carried with it an understanding that he would also be subject to the UCMJ part-time. His acceptance of the reserve pay billet and his subsequent voluntary participation in INACDUTRA drills and ACDUTRA confirm his understanding of the terms and conditions of his enlistment obligations.

Judge Hamley of the United States Court of Appeals, Ninth Circuit, studied the legislative history of Article 2, UCMJ, 10 U.S.C.A. § 802, before he rendered the opinion in *Wallace v. Chafee, supra.* He noted, and we agree, that Congress did not contemplate nor intend that a reservist exercise an individual choice whether or not he would subject himself to the UCMJ before attendance at each drill. Once a person voluntarily changes his status from full-time civilian to part-time sailor, he cannot thereafter unilaterally withdraw from the service, repudiate his contractual obligations, resume his status as full-time civilian, and thereby defeat UCMJ jurisdiction. *Wallace v. Chafee, supra,* defined the contractual obligations assumed by the Naval reservist once he or she has voluntarily executed an enlistment contract. One of those enlistment obligations subjects the reservist to the UCMJ when he or she reports for training duty.

The leading military case in this area is *United States v. Schuering, supra.*[2] The accused, Private (PVT) Schuering, was a Marine reservist charged with stealing Government micrometers during a regularly scheduled drill period. PVT Schuering admitted his guilt and submitted himself for nonjudicial punishment. However, his unit commander referred the matter to the Reserve District level with a recommendation that PVT Schuering be tried by special court-martial. PVT Schuering was released from that drill period but he was informed that he would be ordered to active duty for trial by court-martial. He later reported for trial, as ordered, and his special court-martial awarded him a bad-conduct discharge, confinement and partial forfeitures. The trial did not take place during a regularly scheduled drill period.

The *Schuering* Court articulated the hornbook law of jurisdiction over inactive duty for training reservists. In effect, the law articulates the elements of jurisdiction as stated in Article 2(a)(3), UCMJ:

1. The reservist must actually be on INACDUTRA.

2. The training must be pursuant to written orders.

3. The written orders must specify that the reservist is amenable to the UCMJ during his training or drill periods.

4. The orders must have been voluntarily accepted by the reservist.

2. *United States v. Schuering,* 16 U.S.C.M.A. 324, 36 C.M.R. 480 (1966), was decided before the 1979 amendments to Article 2, *Uniform Code of Military Justice.* Those amendments had no impact on that portion of the Article, which was previously enumerated Article 2(3), other than to add the subparagraph designation. "(a)" before the (3).

Specifically, the Court noted that the accused reservist must be subject to the UCMJ when the offense was committed and at the time of trial.

At page 484 of its opinion, the *Schuering* Court recognized that an offender might be court-martialed at a later drill period for any offense committed at an earlier drill period. The Court applied common sense to its analysis of the law and held that an accused is liable to trial by court-martial during any period of training, subject only to the statute of limitations, citing *United States v. Noble,* 13 U.S.C.M.A. 413, 32 C.M.R. 413 (1962) and *United States v. Martin,* 10 U.S.C.M.A. 636, 28 C.M.R. 202 (1959). However, the Court held that PVT Schuering could not be tried by court-martial, *in that case,* due to a restrictive Marine Corps Order which placed limitations on the exercise of court-martial jurisdiction within the Marine Corps.

*United States v. Harris,* 11 M.J. 690 (N.M.C.M.R.1981), involved the prosecution of a Marine Corps reserve officer who was on active duty for presenting fraudulent claims for lodging received during a previous period of active duty. This Court held that there was a proper jurisdictional basis for the trial because the trial court had jurisdiction over the offense and had jurisdiction over the accused at the time of trial. The Court ruled that jurisdiction could be continued over a reservist from one period of reserve training to another; however, the question concerning the status of a person performing INACDUTRA was not specifically addressed. Therefore, that case is distinguished from the case at bar because this accused was on active duty as a reservist both at the time the offenses were committed and at the time of trial. We draw on the decision solely for precedent that the Government may prosecute a reservist for offenses committed at an earlier period of reserve duty when he reports for a subsequent period of reserve duty.

*Wallace v. Chafee, supra,* in the civilian sector, and *Schuering, supra,* in the military, directly address the issue of jurisdiction to try by court-martial a reservist on inactive duty for training. Two sea-service decisions offer some additional help. The first is *United States v. Abernathy,* 48 C.M.R. 205 (C.G.C.M.R.1974).

Fireman Abernathy was accused of being drunk on board a Coast Guard vessel and of willfully damaging military property of the United States while serving as a reservist on inactive duty training. He testified that he never received, nor did he voluntarily accept, orders which specified that he would be subject to the UCMJ while performing INACDUTRA. The Coast Guard decision reflects that they examined the record and found no evidence to contradict Fireman Abernathy's testimony. The case was set aside on a jurisdictional basis solely because the Government failed to factually establish Fireman Abernathy's voluntary acceptance of any orders which specified that he was subject to the UCMJ. The lead opinion stated:

> But there appears to be no signed acceptance of orders by Abernathy in existence. If there were, there would be no question of jurisdiction in this case. *Supra,* 48 C.M.R. at 207.

The concurring opinions reached the same conclusion by different rationales. We read the case as standing for the proposition that properly drafted orders, voluntarily accepted, confer jurisdiction over the person when the person is performing INACDUTRA.

In 1979, this Court decided the second case alluded to above, *United States v. Duvall,* 7 M.J. 832 (N.C.M.R.1979). The issue was whether the commanding officer of Carrier Airborne Early Warning Squadron 78 (VAW–78), a reserve force squadron, could properly convene a special court-martial. While on ACDUTRA, the commanding officer functioned fully as a squadron commanding officer. However, when he returned home and resumed his full-time civilian occupation, his squadron operations officer acted as the squadron's officer-in-charge, pursuant to orders issued by higher authority. The subject special court-martial referral was accomplished by a phone authorization received from the commanding officer's home while the commanding

officer was in an inactive duty status. This Court ruled that the commanding officer was not empowered to exercise his command prerogative in that setting since administrative command functions vested in the operations officer during those periods when the commanding officer was not present for training duty. The Court determined that the commanding officer was not in command when he was not physically present with his squadron.

This Court reiterated that: "Members of a reserve component are subject to the UCMJ only while they are on inactive duty training authorized by written orders which are voluntarily accepted by them and which specify that they are subject to the Uniform Code of Military Justice. UCMJ, Article 2(3), 10 USC section 802(3)." *Supra*, 7 M.J. at 834.

We conclude that the *Duvall* decision does not apply in this instance. It addresses the sole question of whether a commanding officer in an inactive duty status has the authority to effect a court-martial referral.

Jurisdiction in this case, based upon Article 2(a)(3), UCMJ, depends on several documents. Appellate Exhibit V is SK3 Caputo's reenlistment agreement. Part C, paragraph 11(a) of the agreement informs him that his reenlistment in the Naval Reserve is more than an employment agreement. It informs SK3 Caputo that, as a member of the Armed Forces of the United States, he will be: "(3) Subject to the military justice system, which means, among other things, that I may be tried by military courts-martial." The reenlistment agreement was completed and executed on 13 June 1982.

■ On that same date, SK3 Caputo requested that he be assigned to "NR CHB 6 DET "A", NRC, STATEN ISLAND, NY." AE VI. As a condition to receiving that assignment, SK3 Caputo committed himself to perform his reserve duties satisfactorily until 13 June 1984. AE VIII. His request for assignment was honored. The warning that he would be subject to the UCMJ was contained within his reenlistment agreement. Also, his assignment to the requested reserve unit was made with the knowledge that such assignment subjected him to the UCMJ while performing training duties. These facts conferred court-martial jurisdiction on his superiors in command. *Wallace v. Chafee, supra.*

■ We conclude that jurisdiction is clearly established by the facts. The United States Navy may court-martial a person in an inactive duty for training status for offenses committed during a previous period of active duty for training. Article 2(a)(3), UCMJ; 10 U.S.C. section 802(a)(3); *United States v. Schuering, supra; United States v. Abernathy, supra; Wallace v. Chafee, supra.*

### PART B

The fact that jurisdiction may attach to try a reservist in an inactive duty for training status for an offense allegedly committed in a previous period of active duty for training does not end our inquiry. We view the crucial issue to be:

DID THE APPELLANT'S COMMANDING OFFICER SUCCESSFULLY PRESERVE JURISDICTION WHEN HE CONTINUED THE APPELLANT'S INACTIVE DUTY TRAINING STATUS BY ISSUING A LETTER WHICH EXTENDED HIS PRESENT DUTY?

Petitioner has presented an emotional argument which highlights the dilemma presently facing him. In civilian life he is a postal service employee, *i.e.*, a letter carrier. He argues that he is a civilian letter carrier who lives with his family and pursues his civilian occupation full-time. The logic advanced is that although he *may* have been subject to the UCMJ while in Hawaii during his period of ACDUTRA, that status terminated when the civilian authorities released him, declined to prosecute, and he resumed his civilian life as family member and mail carrier, at home, in Staten Island, New York. He argues that, even when he appeared at the Reserve Center for training, he was a civilian. He further argues that while he performs INACDUTRA he remains a civilian and, like any other civilian, he cannot be subject to trial by court-

martial. We conclude that his argument implies that his reserve unit commanding officer could not continue his status and thereby preserve the jurisdiction which we hold existed when he reported for his drill on 12 March 1983.

The argument is certainly emotional and possibly persuasive to certain elements of our society, but the logic fails to address the real significance of a reserve enlistment. Our Nation has consciously made a rational choice to limit the size and strength of our active duty military forces. Within this philosophy is the recognition that in this volatile world, the regular armed forces are neither large enough nor strong enough to adequately defend our national interests when faced with international conflict. We have eliminated the draft and depend instead on a highly trained, reserve armed force to augment our regular forces when faced with a national emergency.

The reserve member commits himself to be called to active duty in defense of the national interests when the President and the Congress deem such action necessary. As a part of this bargain, the Government has agreed to train the reservist to perform his military duty professionally and efficiently when called to active duty. To ensure the bargain is attractive to both parties to the agreement, the Government provides training but also pays designated drilling reservists for the time spent during INACDUTRA and for periods of ACDU-TRA. Additionally, the bargain provides that the drilling reservist may earn a military retirement if he successfully completes 20 years of satisfactory reserve military service. SK3 Caputo received pay for the drills he attended and he was earning credit toward a 20-year retirement.

Although we are committed to a dependence on a viable reserve force, it has been recognized that discipline is a cornerstone of a strong military organization. Article 2, UCMJ, specifies those persons who are subject to the Code. Both active duty and reserve members of the armed forces are obligated to forfeit certain rights when they become members of defense organizations. This underlying need has been recognized by each of the civilian and the military Courts which have addressed the issue.

SK3 Caputo allegedly committed a serious wrong which affects the morale, discipline and efficiency of the Navy. We turn to the events of 12 March 1983, to determine if his superiors followed the correct procedures to effect and continue court-martial jurisdiction over him. As set forth by Judge Haldeman, SK3 Caputo reported for a regularly scheduled inactive duty training drill. After he reported for duty he was advised of the charges against him and ordered into pretrial confinement. At the same time his commanding officer extended his INACDUTRA status for an indefinite period. AE X.

The procedure followed was in complete conformity with MILPERSMAN 3420320(6), subparagraph (6)(b). The disciplinary process was initiated in the same manner as for Regular Navy personnel—with the slight modification required, i.e., an extension of appellant's "present duty status." The record reflects no change in that status since 12 March 1983. Pursuant to MILPERSMAN 3420320(6)(b), appellant was continued (or retained) in his existing duty status pending completion of the disciplinary process. The fact that he was charged and ordered into pretrial confinement reflects that jurisdiction attached with a view to trial. However, we must examine the facts closely to determine if these actions were legally sufficient to preserve personal jurisdiction for the purpose of trial and punishment.

We must reexamine United States v. Schuering, supra. As previously stated, the decision laid out the prerequisites for jurisdiction to attach pursuant to Article 2[a](3), UCMJ. The Schuering Court stated, at 36 C.M.R. 482, that: "Had the accused been tried then and there, the court-martial would have had jurisdiction over his person and the offense. Cf., United States v. Hooper, 9 U.S.C.M.A. 637, 26 C.M.R. 417 (1958). Then, at 36 C.M.R. 484, the Court said, "it is appropriate to apply the general

rule that a court-martial may try an accused for an offense committed when he was subject to military law, if he is also subject to such law at the time of trial, notwithstanding there was an interval of time between the offense and trial when he was not amenable to military law." Finally, at 36 C.M.R. 486, we find: "It is well-settled that jurisdiction which attaches by timely commencement of proceedings against the accused survives a change of status on his part. The principle is discussed in paragraph 11*d*, Manual for Courts-Martial ... and has been given effect in a number of cases in this Court. [citations omitted.]" The Court held, however, that the command did not institute proceedings against the accused sufficient to satisfy the requirements of paragraph 11 *d, Manual for Courts-Martial, 1969 (Rev.)* (MCM), before he was released from that drill. Although the Government could have perfected jurisdiction at the drill, it did not and the Court held that under the circumstances of that case, the accused could not be ordered to active duty for trial.

*United States v. Mathwich*, 42 C.M.R. 937 (N.C.M.R.1970), also involved a Marine reservist. He was charged with disobeying an order to draw his weapon from the armory to go on two weeks of training duty with his unit. Mathwich was a conscientious objector. The decision purported to reexamine the law previously discussed in *United States v. Schuering, supra,* and noted that PVT Schuering could not be court-martialed because no action sufficient to attach court-martial jurisdiction had occurred during his training duty, while he was subject to the Code. The Court factually resolved the *Mathwich* case without resort to the legal principles discussed in *Schuering.* It was determined that sufficient action with a view toward court-martial had not been instituted in a timely manner, *i.e.,* before Mathwich completed his two weeks of training duty. In effect, the Court held that the command released him from his two weeks of active duty for training without initiating action legally sufficient to confer jurisdiction for a trial to occur during a subsequent period of inactive duty training. Although the Court did not state that they were applying the rules of paragraph 11*d* MCM, the factual determination suggests that was the case.

It is significant, in the *Mathwich* case, that *all* facts necessary to make the decision whether or not to go to trial by court-martial were fully known and developed during the two weeks of the accused's active duty for training. The trial involved the disobedience of a direct order. All the necessary witnesses were available and there was adequate time to complete the trial during the training period when the accused was subject to the Code. However, the trial did not commence until some nine months later. *See* Moyer, Jr., *Justice and the Military,"* sec. 1–251 through sec. 1–260.

*United States v. Self,* 13 M.J. 132 (C.M.A. 1982), involved the prosecution of a national guardsman on active duty. In that case the accused was ordered to active duty for training to complete his military occupation specialty (MOS). He committed the offense during that training period and his status was continued (on active duty) for the purpose of prosecution.

In its analysis, the Court of Military Appeals (COMA) stated:

> [T]he State's consent to the initial call of the guardsman to active duty must be viewed as including any extension of military jurisdiction prescribed by the Manual for Courts-Martial which is promulgated by Presidential Executive Order pursuant to the congressional authorization in Article 36 of the Uniform Code, 10 USC 836, or retention on active duty pursuant to Army Regulations. *Supra,* 13 M.J. at 135.

COMA drew from paragraph 11*d*, MCM, in its analysis to support its determination that status may be continued to preserve jurisdiction once it has attached so long as action with a view to trial is continued.

Although the cases which address jurisdiction over an inactive duty reservist while he is performing inactive duty training suggest that paragraph 11*d*, MCM, applies, just as it does to active duty personnel, no case has specifically held that it applies. The paragraph in question states:

930

d. Effect of termination of term of service. Jurisdiction having attached by commencement of action with a view of trial—as by apprehension, arrest, confinement, or filing of charges—continues for all purposes of trial, sentence, and punishment.... Similarly, if jurisdiction has attached by the commencement of action before the effective terminal date of self-executing orders, a person may be held for trial by a court-martial beyond that terminal date.

We will carry the *Mathwich-Schuering* discussions to a logical conclusion. We hold that paragraph 11*d* of the MCM applies to continue jurisdiction which has attached pursuant to Article 2(a)(3) of the UCMJ. *United States v. Mansbarger,* 20 C.M.R. 449 (A.B.R.1955).

■ We have applied our holding to the facts of this case and have examined the pertinent service regulations to resolve the ultimate issue. The pertinent service regulations applicable to reservists performing inactive duty training are found at subparagraphs 6*b* and *c* of MILPERSMAN 3420320. They specifically state:

b. When a breach of discipline is of such a character as to warrant trial by a special or a general court-martial, the offender shall be retained in the present duty status until completion of action in the case to avoid loss of jurisdiction of [sic] the offender. In order to perfect the jurisdiction, positive action with a view to trial; apprehensions, arrest, confinement or other restraint, or filling [sic] of charges, must be taken immediately.

c. If a reservist commits an offense while subject to the Code, he or she is liable to nonjudicial punishment or trial by court-martial in each or any subsequent period of training duty when he or she is properly subject to the Code, subject only to the statute of limitations for the offense charged.

Our examination of the law and the facts of this case leads us to the inevitable conclusion that jurisdiction attached to appellant, while he was an INACDUTRA reservist.

It continued for the purpose of trial and sentence because positive action, with a view to trial by court-martial, was initiated during a training period and appellant was continued in his INACDUTRA status pursuant to timely action initiated by his commanding officer.

PART C

■ For the period covered by the alleged offenses, SK3 Caputo voluntarily accepted orders to travel with his unit to Pearl Harbor, Hawaii, and his acceptance of the orders acknowledged that he would be subject to the UCMJ for the period of AC-DUTRA. AE IX. The question of jurisdiction over the offenses alleged is resolved by *United States v. Trottier,* 9 M.J. 337 (C.M.A.1980) and *United States v. Lockwood,* 15 M.J. 1 (C.M.A.1983). The possession of significant quantities of illegal drugs for distribution, by active duty service members and those in a training status, impacts on an armed force's readiness to fight. We find that illegal possession in such circumstances is service connected.

CONCLUSION

In Part A, we determined that a member of a reserve component may be court-martialed while he is on inactive duty training authorized by written orders voluntarily accepted by the member, so long as the acceptance of orders to the member's component specified that he would be subject to the UCMJ if so assigned. We also found that once jurisdiction attached during an active duty training period, it could be revived at a subsequent inactive duty training period. In Part B, we found that the Government initiated action with a view toward court-martial during the inactive duty training period which was adequate to attach jurisdiction and continue it for all purposes of trial, sentence, and punishment. In Part C, we held that the offenses of illegal possession of significant quantities of restricted drugs and unauthorized absence are service connected, regardless of the fact

that the alleged offender was a reservist performing training duties at the time of the alleged offenses.

We hold that the petitioner is subject to the jurisdiction of the UCMJ for the offenses he allegedly committed while performing ACDUTRA and that jurisdiction over the person was legally achieved at a subsequent INACDUTRA period when his unit followed the procedures delineated by MILPERSMAN, section 3420320(a)(b) to effect and continue jurisdiction. Accordingly, the petition is denied.

Senior Judge GLADIS and Judge BYRNE concur.