In re James Kimo KEALOHA and Miulan Y. Kealoha, Debtors.

FIRESIDE THRIFT OF HAWAII, INC., a Hawaii Corporation, Plaintiff,

v.

James Kimo KEALOHA and Miulan Y. Kealoha, Defendants.

Bankruptcy Nos. 77–00193(1), 77–00194(1).

United States Bankruptcy Court, D. Hawaii.

Jan. 11, 1980.

Bernard J. Allard, San Jose, Cal., Rodney M. Fujiyama, Paul H. Sato, Honolulu, Hawaii, for Fireside Thrift of Hawaii, Inc.

Charles E. Pear, Jr., John R. Dwyer, Jr., Honolulu, Hawaii, for debtor.

Renton L. K. Nip, Honolulu, Hawaii, for Chuck & Pai Firm.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

JOHN J. CHINEN, Bankruptcy Judge.

Fireside of Hawaii, Inc.'s, hereafter "Fireside", Motion for an Order Amending, Changing or Modifying the Order Modifying Stay and Directing Foreclosure Sale of Debtors' Waikiki Property, hereafter "Motion to Amend", came on for hearing on May 10, 1979, December 3, 1979, December 4, 1979 and December 5, 1979, before the undersigned Judge. Fireside was represented by Bernard J. Allard, Rodney M. Fujiyama (May 10, 1979 hearing) and Paul H. Sato (December 3–5, 1979 hearings), Debtors James K. Kealoha and Miulan Y. Kealoha, hereafter both referred to as "Debtors", were represented by John R. Dwyer and Charles E. Pear, Jr., and Walter Chuck and Associates, formerly known as Chuck & Pai, hereafter "Chuck Firm", were represented by Renton L. K. Nip. Based upon the evidence adduced, arguments of counsel and the memoranda and the records filed herein, the Court makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. On or about May 2, 1974, Fireside agreed to a reconsolidation of certain loans to Debtors. As such, Debtors executed a Promissory Note dated May 2, 1974 in favor of Fireside for the Principal sum of $885,-982.33. To secure said note, Debtors gave a first mortgage to Fireside on four parcels of land situated in Waikiki, City and County of Honolulu, State of Hawaii, hereinafter called "Waikiki Property", and other parcels located in the County of Hawaii, State of Hawaii.

2. Subsequently, Debtors defaulted in the payments required under said Note and Mortgage.

3. Thereafter, Fireside commenced a foreclosure action (Civil No. 3746) against Debtors by way of a crossclaim in a foreclosure action commenced by the holder of a second mortgage against Debtors in the Third Circuit Court of the State of Hawaii, hereafter called "State Court".

4. On or about May 16, 1976, a foreclosure sale was ordered by the State Court of the properties subject to said Mortgage, and a foreclosure sale of the Waikiki Property was scheduled for May 18, 1977.

5. Under said Note and Mortgage, Debtors were responsible for any and all reasonable attorneys' fees and costs incurred by Fireside as a result of having to enforce its rights and remedies under said Note and Mortgage.

6. In addition, pursuant to Section 667–10, Hawaii Revised Statutes, Debtors were also responsible for all reasonable commissioner's fees and costs incurred in the foreclosure of the Waikiki Property.

7. On May 17, 1977, Debtors filed a Chapter XII Petition in this Bankruptcy Court, and pursuant to Rule 12–43 of the Rules of Bankruptcy Procedure, an automatic stay of the foreclosure sale was effected by the filing of said Petition. The foreclosure sale of the Waikiki Property scheduled for May 18, 1977 was thereby cancelled.

8. On May 27, 1977, Fireside filed a Complaint for Relief from Automatic Stay to allow the resumption of State Court foreclosure proceedings to sell all of the property subject to its mortgage.

9. On September 14 and 15, 1977, trial was held before the Honorable Samuel P. King, during which the Kealohas sought additional time in which to sell the Waikiki property without foreclosure.

10. On October 12, 1977, the Kealohas filed their plan of arrangement, which provided for a sale of the Waikiki property to Hasegawa Komuten (U.S.A.) Inc. The sale was to be accomplished by order of the Bankruptcy Court and without a foreclosure in the State Court. $1,076,000.00 was to be disbursed to Fireside and the balance of the proceeds were to be distributed to other secured creditors and the Debtor Estate.

11. On October 21, 1977, Joseph V. Marchese, an officer of Fireside, and Walter G. Chuck and Charles H. Brower as attorneys for Fireside, met with Monroe S. Townsend, an officer of Hasegawa, and Douglas E. Prior, Nicholas C. Dreher, and H. Miles Raskoff, attorneys for Hasegawa, in the conference room of Hasegawa's attorney, Cades, Schutte, Fleming & Wright. Subsequently, Charles E. Pear, Jr., attorney for Kealohas, was called and asked to attend a meeting to discuss a compromise and settlement proposal from Fireside.

12. Mr. Marchese of Fireside proposed that the sale of the Waikiki Property be concluded by allowing the State Court foreclosure sale to proceed rather than going through the adoption of the plan of arrangement. Mr. Marchese also proposed as part of the compromise that $84,000.00 of reimbursable expenses, which was to be retained by the Debtor Estate under the plan of arrangement, instead be paid over to Fireside in the foreclosure sale. Fireside would thus receive $1,160,646.00 under Fireside's settlement proposal rather than $1,076,000.00 contemplated by the plan of arrangement filed by the Kealohas.

13. Upon hearing the settlement proposal, Mr. Pear asked if Fireside would absorb its attorneys' fees and the fees of commissioners appointed by the State Court, if the Debtor Estate paid the remaining principal balance due Fireside.

14. Mr. Marchese then asked his attorneys the amount of Fireside's attorneys' fees. Mr. Chuck represented that his fees were between $13,000.00 to $14,000.00.

15. Mr. Pear then asked if that was all. There was no reply by Mr. Chuck, who referred Mr. Pear to Mr. Marchese.

16. Mr. Pear believed that the attorneys' fees quoted by Mr. Chuck represented the full amount of Fireside's attorneys' fees and costs.

17. The amount of the commissioner's fees were discussed next. Mr. Marchese estimated the commissioner's fees would be approximately $4,500.00, $1,500.00 to Donald Martin and $3,000.00 to Lowell Ing.

18. Mr. Marchese then stated that Fireside would be willing to absorb its own attorney's fees and the commissioner's fees if the remaining principal balance due Fireside was paid at the time the sale to Hasegawa closed or within a reasonable time thereafter.

19. At that time, Fireside and its counsel were aware that, to satisfy any deficiency remaining after the closing of the sale to Hasegawa, the Kealohas contemplated seeking a loan from the First Hawaiian Bank to be secured by a mortgage on the Kealoha's Hilo home, which was then encumbered by Fireside's mortgage.

20. Mr. Pear then indicated that he would recommend the settlement proposal to his client and, if his client approved, that he would join in recommending the proposed settlement to the Court.

21. Immediately after the settlement negotiations, Mr. Pear met with the Kealohas. After that, Mr. Pear met with the creditors committee.

22. A hearing on the confirmation of the proposed plan of arrangement was held that afternoon. All of the persons who attended the settlement negotiations that morning also attended the confirmation hearing, including Mr. Marchese. At the hearing, the adoption of the settlement proposal in place of the plan of arrangement was recommended by counsel for both Fireside as well as the Kealohas to the Bankruptcy Court. During the hearing, Mr. Chuck represented that:

Fireside has also agreed, your Honor, that if it is paid its interest in full, that it will not ask for its attorneys' fees or commissioner's fees—it will absorb that.

23. At the hearing, no one mentioned a limitation of $20,000.00 on attorney's fees and commissioner's fees to be absorbed by Fireside.

24. Mr. Kealoha testified that his understanding of the settlement proposal was that all of Fireside's attorneys' legal fees and commissioner's fees would be paid by Fireside, but that he would have to forego the $84,000.00 of reimbursable expenses.

25. No objection to the settlement proposal presented was made by the creditors committee or the creditors present, so this Court approved the proposed settlement as submitted to the Court.

26. Immediately after the hearing, Messrs. Pear, Raskoff and Dreher attempted to draft a form of an Order for the Court's approval. However, Mr. Pear left Messrs. Dreher and Raskoff to draft his own order.

27. Mr. Pear prepared the initial draft of the Order relating to said Motion and forwarded a copy of the same to the Chuck Firm on October 26, 1977.

28. Mr. Brower of the Chuck Firm reviewed and revised said draft on October 26, 1977 and on October 27, 1977 including a one-hour meeting in Pear's office and 4½ hours on the later date spent revising said draft.

29. Mr. Chuck also reviewed the draft of the order and on or about October 27, 1977, Mr. Chuck approved the form of said Order as attorney for Fireside, and signed it.

30. On October 27, 1977, this Court entered the Order Modifying Stay and Directing Foreclosure Sale, which had been approved by Mr. Chuck for Fireside and William H. Dodd for Charles Pankow & Associates. Said Order provided in pertinent part that:

AND IT IS FURTHER ORDERED that the balance of the Fireside Thrift claim *remaining unpaid after Hasegawa Komuten (U.S.A.) makes payment* will continue to be secured by the Kealoha's Puna property and the home, until the Kealohas pay the remaining principal plus all additional interest in full.

AND IT IS FURTHER ORDERED that payment by the Kealohas of Fireside Thrift's remaining principal balance and additional accrued interest, as indicated

above, in full, shall operate *as a full and complete discharge and extinguishment* of any and all debts owed by the Debtors to Fireside Thrift, including claims *for reimbursement of attorneys' fees, costs, and commissioners' fees.* [Emphasis added].

31. This Court's "Conclusions of Law" filed herein on November 30, 1979, provides that said Order was in effect "a judgment by consent of the compromising parties".

32. From October 21 to 26, 1977, Mr. Chuck spent at least 8.3 hours and Mr. Brower spent between 6 and 8 hours preparing an appropriate motion, findings of fact, and order to amend the State Court foreclosure order so as to allow the sale of the Waikiki Property on the terms set forth in the Order of this Bankruptcy Court.

33. The State Court Order prepared by Mr. Chuck and Mr. Brower does not mention or allude to the alleged $20,000.00 limit, although it deals with commissioner's and attorneys' fees.

34. During the hearing on the motion in the State Court held on October 28, 1977, Mr. Pear cross-examined Mr. Marchese under oath and asked him if Fireside would absorb its attorneys' fees and costs. Mr. Marchese testified that Fireside would do so, "within reason. I had estimated commissioner's fees inasmuch as they had not completed the sale."

35. At the hearing of the present motion, Mr. Marchese testified that during the 1977 State Court hearing, he believed that there was a $20,000.00 limit on the attorneys' and commissioner's fees Fireside would pay, but that he did not state his belief that a limit existed and did not advise the Court of that belief.

36. In the State Court hearing, Mr. Chuck represented in response to a question by the Court:

At the present time, your Honor, the fees—commissioner's fees and attorney's fees are reasonable. Fireside would be picking them up.

37. There is no documentary evidence made on or about October 21 through Octo-

ber 28, 1977 that indicates in any fashion that there was a $20,000.00 limitation with respect to Fireside's agreement to absorb all reasonable attorneys' and commissioner's fees and costs.

38. Mr. Marchese and Mr. Chuck stated that it was their understanding that the compromise and settlement agreement embodied in said Order contemplated a $20,000.00 limitation on Fireside's liability for attorneys' and commissioner's fees and costs. Mr. Chuck further stated that the $20,000.00 limitation was omitted from the Order by a mistake made by his firm.

39. Mr. Townsend of Hasegawa and its attorneys, Mr. Prior and Mr. Dreher, testified that it was their understanding that Mr. Marchese had mentioned some form of limitation on the liability of Fireside for commissioner's and attorneys' fees, but could not recall the precise amount of said limitation.

40. Mr. Pear testified that it was his understanding that there was no dollar limitation as to Fireside's agreement to absorb reasonable commissioner's and attorneys' fees and costs and that he had drafted and presented said Order to the Chuck Firm and to the Bankruptcy Court based on that understanding.

41. Mr. Kealoha testified that he attended the bankruptcy hearing on October 21, 1977, at which time the Order was approved, and that it was his understanding that his Estate would no longer be entitled to said $84,000.00 of reimbursable expenses but that Fireside would absorb all commissioner's and attorneys' fees and costs.

42. Mr. Marchese testified that his estimate of Fireside's attorneys' fees and commissioner's fees totalled less than $20,000.00. He further testified that his authority to absorb the attorney's fees and commissioner's fees was limited to $20,000.00.

43. Mr. Pear testified that on or about December 8, 1977, Mr. Marchese advised Mr. Pear that Fireside was having a discussion with the Chuck Firm over the amount of the Chuck Firm's attorneys' fees and

that Marchese was concerned that the Chuck Firm would not process the closing documents expeditiously. Mr. Pear testified that this was the dispute between Fireside and the Chuck Firm referred to in Mr. Pear's December 8, 1977 letter to Chuck and Brower.

44. Mr. Chuck testified that, as of December 8, 1977, there was not a dispute between the Chuck Firm and Fireside over attorneys' fee.

45. Mr. Marchese testified and admitted that there was in fact a dispute between the Chuck Firm and Fireside over the amount of attorneys' fees. Mr. Marchese also testified that he could not recall when the fee dispute first arose, but that it had arisen at least when the Chuck Firm rendered its January, 1978 bill which included the $20,063.20 bonus legal fee in addition to the $19,936.80 for fees billed hourly.

46. By letter dated February 28, 1978, Mr. Marchese advised Mr. Pear: "As we had discussed in December of 1977 . ." all future communication from the Kealohas were to be made directly to Fireside "without any intermediary, such as counsel, etc." Mr. Marchese further advised:

It is our feeling that there is no longer a need for Fireside Thrift of Hawaii, Inc. to be represented by counsel in any further transaction between ourselves and your firm, and, as such, *we see no need to incur additional legal expenses.* [Emphasis added].

47. On or about October 27, 1977, both the Kealohas and Fireside contemplated that there would be a deficiency in the amount of approximately $19,000.00 upon the closing of the sale to Hasegawa. However, a delay in closing substantially increased the ultimate deficiency amount because of the ongoing accrual of interest on the principal balance owing to Fireside.

48. The closing of the sale of the Waikiki Property concluded on December 22, 1977 and thereupon funds in the amount of $1,160,646.00 were distributed to Fireside (including the $84,000.00 of reimbursables to be paid to Fireside under the settlement agreement) leaving an unpaid principal balance of approximately $36,000.00.

49. The delay in said closing from October 28, 1977 until December 22, 1977, was not the fault of either the Kealohas or Fireside; however, the delay had the effect of increasing the Kealohas deficiency from approximately $19,000.00 to approximately $36,000.00.

50. On December 29, 1977, the Kealohas made their first payment toward reduction of the unpaid principal balance in fulfillment of the Order. The payment was in the amount of $23,125.00, representing a portion of the proceeds from the condemnation of a certain portion of the Waikiki parcel. This payment had been agreed to in the Stipulated Distribution of Proceeds filed with the Bankruptcy Court on November 10, 1977.

51. On February 17, 1978, the Kealohas made application to this Court for authority to borrow money from the First Hawaiian Bank, a copy of which was delivered to the Chuck Firm.

52. On February 28, 1978, the Kealohas tendered and Fireside accepted payment of an additional $1,875.00 toward the reduction of the principal balance.

53. By letter dated March 1, 1978, Mr. Pear advised Fireside and Mr. Marchese that the Bankruptcy Court had approved the Kealoha's application for authority to make the loan and that payment to Fireside of its deficiency would be made when its lien was listed. Neither Fireside, Mr. Marchese nor the Chuck Firm responded to Mr. Pear's correspondence or advised Pear or the Kealohas that it would no longer accept payment of the deficiency on the grounds that the reasonable time for payment had expired.

54. In March of 1978, Marchese reviewed for the first time the Order Modifying Stay and the State Court Order and discovered that the $20,000.00 limitation on the fees Fireside was willing to absorb and the time limitation on payment of the deficiency by the Debtor were omitted from said Order. Marchese did not discover the mistake and inadvertent omission earlier

since it had not been the Chuck Firm's policy to send copies of the pleadings filed in either the Bankruptcy Court action or in the State Court action to Fireside.

55. Upon discovering the omission in the Order Modifying Stay and the State Court Order, Marchese requested that the Chuck Firm make the same known to the Debtors.

56. As a result, by letter of March 22, 1978, the Chuck Firm, on behalf of Fireside, advised Pear that (1) Fireside believed that it had a $20,000.00 limitation on attorneys' fees and costs; (2) that commissioner's fees and attorneys' fees may exceed said $20,-000.00 limit; (3) that Fireside and the Chuck Firm were in the process of resolving the question; and (4) that until Fireside and the Chuck Firm resolved the question, that Fireside would not lift its mortgage lien on the Kealoha's home which was to be mortgaged to First Hawaiian Bank for the purpose of providing funds to pay the balance owed to Fireside.

57. Said March 22, 1978 letter from the Chuck Firm was the first document that evidenced any understanding of Fireside or its attorneys that Fireside's liability for attorneys' fees and commissioner's fees was limited to $20,000.00.

58. On the very next day, Mr. Pear returned a letter stating: "Please be advised that it is not our understanding that there is any dollar limit on the amount which Fireside has agreed to absorb."

59. The Kealohas tendered and Fireside accepted payments ranging from $250.00 to $1,000.00 on a monthly basis from April until October 1978, whereupon the remaining unpaid principal balance and all accrued interest was tendered in full. Fireside refused the tender and refused to lift its mortgage on the property mortgaged to Fireside.

60. At no time (including the date in October of 1978 when Fireside refused the tender of the Kealohas) prior to February, 1979 did Fireside raise the issue that the reasonable time for payment of the remaining deficiency had expired.

61. At the time of the hearing of the present motion, the unpaid principal balance owed by the Kealohas to Fireside was approximately $12,000.00.

## CONCLUSIONS OF LAW

1. On October 27, 1977, this Court entered its Order Modifying Stay and Directing Foreclosure Sale of Debtor's Waikiki Property, which was based upon a compromise settlement proposal presented to the Court by Fireside and accepted by the Kealohas. Said Order had been reviewed and approved by counsel for Fireside before it was presented to the Court for its approval.

2. In its "Conclusions of Law" filed herein on November 30, 1979, this Court held that the Order was in effect "a judgment by consent of the compromising parties." This Court further held that:

Unless the said Order of October 27, 1977 is modified, amended or held not binding for any other reason by the Bankruptcy Court, said Order is binding upon the parties involved in the Consent Order.

3. The cases have held that compromise agreements entered into for the purpose of settling genuine disputes are binding. *Richards Construction Co. v. Air Conditioning Co. of Hawaii*, 318 F.2d 410 (9th Cir. 1963). In *Kraly v. National Distillers & Chemical Corp.*, 319 F.Supp. 1349 (N.D.Ill. 1970) aff'd 502 F.2d 1366 (7th Cir. 1971), the Court stated:

It is a basic tenet of American jurisprudence that settlements are favored by the courts and that the terms contained therein binding upon the parties. *Id.* at 1351.

4. Settlement agreements are contracts and their interpretation is governed by contract law. *Richards Construction Co. v. Air Conditioning Co. of Hawaii*, 318 F.2d 410 (9th Cir. 1963). In *Homestake-Sapin Partners v. United States*, 375 F.2d 507 (10th Cir. 1967), the Court stated:

Settlement stipulations [are] of course, contracts. And, if the intent of the parties becomes an issue, it should be gathered from the language of the contract,

and resort to extraneous facts is justified only if the contract itself creates an ambiguity; ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning the meaning of the contract. *Id.* at 511.

5. Counsel for Fireside thoroughly reviewed the terms of the agreement before signing it on behalf of Fireside and submitting it to this Court. Fireside cannot now be heard to declare that it misread the order or was ignorant of its content.

As the court in *Wallace v. Chafee*, 451 F.2d 1374 (9th Cir. 1971) noted:

> One who enters a contract is on notice of the provisions of the contract. If he assents voluntarily to those provisions after notice, he should be presumed, in the absence of ambiguity, to have understood and agreed to comply with the provisions as written. This is Hornbook contract law. *Id.* at 1377.

6. The Parol Evidence Rule, being a substantive rule of law, excludes extrinsic evidence of the surrounding facts and circumstances existing prior to or contemporaneously with the execution of a written instrument where such evidence seeks to contradict, defeat, modify, or otherwise vary the meaning or legal effect of the instrument. *Akamine & Sons, Ltd. v. American Security Bank*, 50 Haw. 304, 440 P.2d 262 (1968); *Midkiff v. Castle & Cooke, Inc.*, 45 Haw. 409, 368 P.2d 887 (1962).

7. The Hawaii Supreme Court in *Akamine & Sons, Ltd. v. American Security Bank*, 50 Haw. 304, 440 P.2d 262 (1968) articulated the rule in the following manner:

> Once the parties execute an instrument which contains their whole agreement, their previous negotiations and agreements are legally ineffective and evidence relating to those previous negotiations or agreements is irrelevant regardless of who offers it. *Id.* at 310, 440 P.2d at 266.

8. Thus, if an instrument shows clearly and unambiguously the agreement of the parties, ancillary explanation is unnecessary.

As the court in *Albright v. R. J. Reynolds Tobacco Company*, 350 F.Supp. 341 (W.D.Tenn.1972), noted:

> Where a case has been *settled by consent of the parties* and the record so indicates, the record cannot be contradicted. [Citation omitted] Where the circumstances indicate a general settlement the release will be given effect according to its terms. [Citations omitted] . . . Plaintiff's counsel wishes to present some evidence of an off-the-record understanding between himself and the counsel for the City of Pittsburg in the settlement of the city suit. Such evidence would be barred by the parol evidence rule . . . . [Emphasis added]. *Id.* at 348.

9. Where the controversy rests entirely on an alleged understanding concerning a subject which is dealt with in writing, it is assumed that the writing was intended to set forth the entire agreement as to that particular subject. *Wigmore on Evidence*, 2d Ed., Vol. 5, p. 309. In the absence of fraud, duress, mutual mistake, or ambiguity, the Parol Evidence Rule requires the exclusion of extrinsic evidence, oral or written. *Industrial Indemnity Co. v. Aetna Casualty and Surety, Co.*, 465 F.2d 934 (9th Cir. 1972).

10. In the case at bar, the writing expressly stipulated for the very sort of thing which Plaintiff attempts to controvert, i. e., it provided that:

> payment by the Kealohas of Fireside Thrift's remaining principal balance *and additional accrued interest*, as indicated above, in full, shall operate as a full and complete discharge and extinguishment of any and all debts owed by the Debtors to Fireside Thrift, including claims for reimbursement of attorney's fees. . . [Emphasis added]

There is no ambiguity in the above provision.

■ 11. The parole evidence rule permits the use of extrinsic evidence to show fraud. *Restatement Second of Contracts*, Section 240. *Industrial Indemnity Co. v. Aetna Casualty & Sur. Co.*, 465 F.2d 934 (9th Cir. 1973).

■ 12. The quantum of proof required in order to establish fraud is generally that of clear and convincing evidence. In *Peine v. Murphy*, 46 Haw. 233, 377 P.2d 708 (1962), the Court noted that:

Fraud is never presumed. Where relief is sought on account of fraudulent representations, the facts sustaining the charge should be *clearly and satisfactorily established*. [Emphasis added] *Id.* at 238, 377 P.2d at 712.

■ 13. The facts of the present case do not show any fraud on the part of Debtors or their counsel. In fact, the evidence before this Court negates any finding of fraud on behalf of the Debtors:

A. Mr. Chuck volunteered the following before this Court on October 21, 1977:

Fireside has also agreed, your Honor, that if it is paid its interest in full, that it will not ask for its attorneys' fees or commissioner's fees—it will absorb that. (Excerpt from transcript of the hearing on October 21, 1977.)

B. The Kealoha's counsel transmitted the proposed form of the Order on October 27, 1977, and Fireside's counsel carefully reviewed the Order before it was submitted to this Court. There is no mention of a $20,000.00 limitation in said Order.

C. The State Court Order, drafted by Fireside's counsel, does not mention the alleged limitation of $20,000.00, even though it specifically provides that Fireside shall pay the commissioner's fees.

D. Kealohas' counsel specifically raised the issue of Fireside's agreement to pay all attorneys' and commissioner's fees and costs when Mr. Pear cross-examined Mr. Marchese (an officer of Fireside) under oath before the State Court on October 28, 1978. Clearly Kealohas' counsel would not have raised that issue if counsel intended to deceive anyone. Mr. Marchese answered Mr.

Pear's cross-examination by saying that Fireside would absorb all reasonable attorneys' fees and commissioner's fees. Mr. Marchese did not mention a limitation of $20,000.00.

E. Again on October 28, 1978 before the State Court, Mr. Chuck stated that:

At present time, your Honor, the fees—commissioner's fees and attorney's fees are reasonable. Fireside will be picking them up.

Thus, both prior and subsequent to this Court's order of October 27, 1977, Mr. Chuck's statements in Court have been consistent with Order of October 27, 1977 as it relates to the payment of attorney's fees. The transcripts of those proceedings speak for themselves, and should not, except in the case of an ambiguity, be amplified or explained by extraneous evidence. *Associates Finance Corp. v. Scott*, 3 Ariz.App. 1, 411 P.2d 174 (1966). Mr. Chuck's and Mr. Marchese's statements corroborate the unambiguous import of the order. Their voluntary statements indicate that a fraud was *not* practiced on them.

14. Since Fireside has failed to carry the burden of showing that the agreement was induced by fraud, parol evidence cannot be admitted to vary the unambiguous terms of this Court's Order based on the theory of fraud. *Starling v. Valmac Industries, Inc.*, 589 F.2d 382 (8th Cir. 1979).

■ 15. Fireside predicates its motion for relief from this Court's order of October 27, 1977 on its representative's "inadvertent error and/or mistake in approving the form of said Order." However, a unilateral mistake is not sufficient to permit the admission of extrinsic evidence.

In the absence of fraud, duress, *mutual mistake*, or ambiguity, the parol evidence rule requires the exclusion of extrinsic evidence, oral or written, where the parties have reduced their agreement to an integrated document. [Citations omitted] [Emphasis added] *Industrial Indemnity Co. v. Aetna Casualty & Sur. Co.*, 465 F.2d 934, 937 (9th Cir. 1972).

16. "The rule is that, in order to vitiate a settlement, a mistake must be mutual and material. . . ." [Citation omitted]. *Anderson v. Ciba-Geigy Corporation*, 490 F.2d 438, 442 (8th Cir. 1974). Also, as the Court in *Mungin v. Calmar Steamship Corporation*, 342 F.Supp. 484, (D.Md.1972) stated:

> As a general principle, the settlement of disputes is favored by the courts, [Citation omitted] consequently, "one who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted." [Citation omitted]. *Id.* at 485.

17. The elements necessary to establish a mutual mistake were cogently set forth in *Southern Agency Company v. La Salle Casualty Company*, 393 F.2d 907 (8th Cir. 1968). There, the court held that to establish mutual mistake warranting setting aside a stipulation settling litigation, the party seeking relief must establish there was a misconception of fact; the fact was material; it was relied upon to party's detriment; and reliance was justifiable.

18. The Court in *Webster v. Woods*, 586 P.2d 337 (Okl.App.1978), found that the burden of proof required to show that a written agreement should be reformed is a heavier burden than usual in civil litigation. In *Neal v. Green*, 71 Wash.2d 40, 426 P.2d 485 (1967), the Court said

> Courts of equity do not grant the high remedy of reformation upon a probability, nor even upon a mere preponderance of evidence, but only upon a certainty of the error. \* \* \* *Id.* at 42, 426 P.2d at 487.

The court went on to hold that in order to justify reformation on the ground of mutual mistake, the party seeking reformation must show the mistake by "clear, cogent and convincing evidence." *Id.* at 42, 426 P.2d at 487.

19. The evidence in this case shows that the elements of mutual mistake are not present as both Mr. Pear and Mr. Kealoha testified that the Order correctly reflects their understanding of the compromise.

20. If there has been any mistake, it has been the unilateral mistake of Fireside in thinking that the agreement of the parties contemplated a $20,000.00 limitation on the attorneys' fees and commissioner's fees Fireside would pay. As Professor Corbin has noted:

> If the mistake of one party to a written instrument is in thinking that it contains a larger promise by the other party than in fact it does, and the other party has no reason to know of their mistake, of course the mistaken party cannot hold the other to the larger promise that he did not make, by getting reformation or otherwise. In such a case, the Court may say that there can be no relief unless the mistake was "mutual," or that the party is "conclusively presumed to know its contents." *Corbin on Contracts*, Vol. I Ed. 1952.

21. Mr. Marchese and Mr. Chuck both testified that, at the meeting of October 21, 1977, there was mention of an agreement to a $20,000.00 limitation on attorneys' fees and commissioner's fees to be absorbed by Fireside. Mr. Marchese further testified that he insisted on the $20,000.00 limitation because his authority to absorb attorneys' fees and commissioner's fees in a compromise was limited to a maximum of $20,000.00.

22. However, Mr. Pear testified that there was no such limitation.

23. It is important to note that none of those representing Hasegawa at the meeting of October 21, 1977 recalled any mention of a $20,000.00 limitation.

24. This Court is of the opinion that there was no mention of a $20,000.00 limitation at the meeting of October 21, 1979. This Court is of the further opinion that there was no mention of a $20,000.00 limitation to the Kealohas or Mr. Pear prior to the letter of March 22, 1978 sent to Mr. Pear by Mr. Brower.

212

25. At the hearing before this Court on October 21, 1979, when Mr. Chuck stated that Fireside would absorb the attorneys' fees and commissioners' fees, there was no mention of a $20,000.00 limitation. Mr. Marchese was present in Court, and he did not mention any $20,000.00 limitation.

26. The Order of this Court dated October 27, 1979 does not mention any $20,000.00 limitation. Before said Order was delivered to this Court for its approval, it was reviewed and approved by counsel for Fireside.

27. At the hearing before the State Court, Mr. Marchese, on cross-examination by Mr. Pear, acknowledged that Fireside would absorb a reasonable attorney's fees and commissioner's fees. He did not mention any $20,000.00 limitation.

28. Likewise, when Mr. Chuck informed the Court that Fireside would absorb reasonable attorney's fees and commissioner's fees, he did not mention a $20,000.00 limitation.

29. And, in his letter to Pear dated February 28, 1978, in connection with the foreclosure sale to Hasegawa, Mr. Marchese stated, "we see no need to incur additional legal expenses."

30. In *Plymouth Mut. Life Ins. Co. v. Illinois Mid-Continental Life Ins. Co.*, 378 F.2d 389 (3rd Cir. 1967), the Court stated:

In ascertaining the intent of the parties, strong evidence may be provided by conduct of the parties themselves that is indicative of their understanding of what they had agreed. *Id.* at 391.

31. The actions of the parties show that a limitation of $20,000.00 on attorney's fees and commissioner's fees was never discussed and agreed upon by Fireside and Kealohas.

32. This Court is of the opinion that because the total amount of the attorney's fees and commissioner's fees discussed at the meeting held on October 21, 1977, was less than $20,000.00, Mr. Marchese was satisfied that the figure mentioned was reasonable and thus agreed that he would absorb those fees without his mentioning a $20,000.00 limitation.

33. Because an agreement had been reached as to the sale of the Waikiki Property, everyone expected that the sale would be completed within a short period without there being much additional attorney's and commissioner's fees incurred. Thus, there was no mention of the $20,000.00 limitation. At the Court hearings, there was only mention of reasonable attorney's and commissioner's fees. Everyone believed that up to the time of the hearing on October 28, 1977 in the State Court, the attorney's fees and commissioner's fees were reasonable and did not exceed $20,000.00. Thus, there was no mention of a $20,000.00 limitation until Fireside received the statement for attorney's fees on February 7, 1979.

34. If there was any mistake in the drafting and/or preparation of the subject Order which embodied the terms of the compromise and settlement agreement, such mistake was the unilateral mistake of Fireside and its counsel, as said Order accurately documented the understanding and intention of the Kealohas and Mr. Pear. Thus, Fireside may not rely on mutual mistake to reform the Order.

35. The Order states that Fireside is obligated to absorb attorney's and commissioner's fees upon payment to it of the "remaining principal balance and additional . . . interest" accrued after the closing of the sale to Komuten.

■ 36. The Order does not explicitly set forth a time for payment. In the absence of a time fixed for performance of a settlement agreement, performance must be rendered within a reasonable time. *Bishop Trust Co. v. Kamokila Dev. Corp.*, 57 Haw. 330, 555 P.2d 1193 (1976); *City and County v. Kam*, 48 Haw. 349, 402 P.2d 683 (1965).

In the *Kam* case, the City and County of Honolulu, agreed to pay to defendant $38,000.00 in settlement of an eminent domain proceeding. The judgment which embodied that agreement did not specify when the agreed amount was to be paid. It was in this context that the Hawaii Supreme Court

ruled that a reasonable time was implied. These facts are virtually identical to the facts of the present case, where a settlement agreement mandating the payment of a certain sum was embodied by a court order which failed to specify a date for payment. Accordingly, as in *Kam*, the Kealohas are entitled to make that payment under the Settlement Agreement within a reasonable period of time.

37. The facts show that a compromise agreement was reached on October 21, 1977 for the foreclosure sale of the Waikiki Property to Hasegawa. This compromise agreement was approved by the Bankruptcy Court and embodied in an Order dated October 27, 1977, referring the matter to the State Court for further action. On October 28, 1977, the State Court approved the direct sale to Hasegawa.

38. As of October 28, 1977, all of the parties involved in the sale of the Waikiki Property to Hasegawa believed that the transaction would close within a short period. However, without there being any fault on the part of Fireside or Kealohas, the sale to Hasegawa did not close until December 22, 1977. This means that the Kealohas had a reasonable time from December 22, 1977, within which to pay the deficiency to Fireside.

39. The question before this Court is: what is a reasonable time under the circumstances in the instant case? If the Kealohas did not pay the deficiency within the reasonable time, was there a waiver of the "reasonable time" on the part of Fireside?

40. A reasonable time is measured in light of the circumstances of the case. As the Hawaii Supreme Court explained this doctrine in *City and County v. Kam*, 48 Haw. 349, 402 P.2d 683, reasonable time is to be determined "upon consideration of the subject matter of the contract, the situation of the parties, what was contemplated at the time the contract was made, and other surrounding circumstances". *Id.* at 354, 402 P.2d at 687. Essentially the same rule has been adopted in other cases decided by the Hawaii Supreme Court. *See*, for example,

*Baldeviso v. Thompson*, 54 Haw. 125, 504 P.2d 1217 (1972); as well as the courts of other jurisdictions. *See Gentry v. Smith*, 487 F.2d 571 (5th Cir. 1973); *Glen Cove Marina, Inc. v. Vessel Little Jennie*, 269 F.Supp. 877 (E.D.N.Y.1967).

41. The circumstances in the instant case are that the Debtors were in Chapter XII proceedings and, until the Hasegawa transaction closed, had an indebtedness exceeding $2,000,000.00 and their major asset—the Waikiki condominium project—was believed to be on the verge of a devastating loss of value if its building permit was lost. Even after the sale of that asset on December 22, 1977, the Debtors continued in Chapter XII proceedings and had a remaining indebtedness owed to unsecured creditors of approximately $500,000.00. The parties to the settlement were aware of these facts and were also aware from the outset that the Kealohas were seeking a $100,000.00 loan to be secured by a mortgage on their home in Hilo, the proceeds of which were to be used in part to pay the balance of the deficiency.

Between the date the Hasegawa sale closed and March 22, 1978, only three months elapsed. The Court recognizes that it is not unreasonable for three months to elapse during the application, processing, credit check, appraising and closing of an ordinary home loan to a qualified borrower. It is reasonable to expect that a borrower in the Kealohas' circumstances would require far longer than the 90 days that elapsed between December 22, 1977 and March 22, 1978 to qualify, if at all, for $100,000.00 loan. Thus, the reasonable time for payment had not expired by March 22, 1978.

42. Fireside presented no evidence that Mr. Kealoha did not proceed diligently in seeking the loan, so it may be presumed that the time actually required to seek, obtain, and finalize the loan was the reasonable time contemplated by the parties to the settlement when viewed in light of "the situation of the parties, what was contemplated at the time the contract was made, and other surrounding circumstances." *City and County v. Kam*, 48 Haw. 349, 354, 402 P.2d 683, 687 (1965).

43. On March 22, 1978, Fireside informed the Kealohas that Fireside would not release its mortgage lien on the Kealohas' home. The settlement clearly contemplated that the mortgage lien would be lifted, for it was understood by all parties, including Fireside, that Mr. Kealoha would be unable to obtain a new mortgage loan on his home unless Fireside's mortgage was released.

44. The Hawaii Supreme Court, in *Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 506 P.2d 9 (1973) stated:

> The general rule is that where a person by his own act makes impossible the performance or the happening of a condition such nonperformance should not relieve him from his obligation under a contract. [Citations omitted] *Id.* at 272, 506 P.2d at 12.

*See also Ikeoka v. Kong*, 47 Haw. 220, 386 P.2d 855 (1963).

45. The effect of Fireside's refusal to release its mortgage lien was to make it impossible for Mr. Kealoha to consummate the new mortgage loan contemplated by the settlement, effectively preventing Mr. Kealoha from paying the deficiency due Fireside. This act by Fireside discharged the condition that payment be made within a reasonable time or, at the very least, suspended the time for payment for so long as Fireside persisted. Fireside's refusal of a tender of the entire deficiency and all accrued interest in October, 1978, illustrates dramatically that Mr. Kealoha's performance was prevented by Fireside. Accordingly, the performance was waived and discharged. "[N]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance. [Citation omitted] The doctrine is purely one of waiver." [Citation omitted] *Kahili, Inc. v. Yamamoto*, 54 Haw. 267, 272–273, 506 P.2d 9, 12 (1973); *Ikeoka v. Kong*, 47 Haw. 220, 228, 386 P.2d 855, 860 (1963).

46. After the March 22, 1978 letter from Fireside, the Kealohas tendered and Fireside accepted monthly payments ranging between $250.00 and $1,000.00 toward reduction of the balance due Fireside. Fireside's acceptance of this benefit without raising the timeliness issue indicates clearly that the time for payment had either not expired or was waived.

In *Stewart v. Spalding*, 23 Haw. 502 (1916), the Court held that a provision stating that time was of the essence was waived by permitting the continued performance of the contract. In the instant case, Fireside continued to accept payments from Kealohas after the March 22, 1978 letter, without any protest or claim that the reasonable period for payment of the deficiency had expired.

Moreover, in the context of a claim for rescission, the law is well settled, that the right to rescind must be exercised promptly and it is waived by treating the contract as a subsisting obligation. *Western Casualty and Surety Co. v. Herman*, 318 F.2d 50 (8th Cir. 1963). This rule has been succinctly summarized as follows:

> [A]ny act indicating an intent to continue the contract is an election, and election to continue may occur simply by failure of the injured party to take action to end the agreement within a reasonable time after becoming aware of the facts. Under that view, if performance continues and is accepted, the right to end the contract cannot be preserved even by explicit expression if intent; any inconsistent act results in the loss of the right, unless the other party assents to its retention by the aggrieved party. The continued acceptance of benefits under the contract is the most common and clearest case of election by conduct. *Cities Service Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct.Cl.1976).

Moreover, in *Johns Hopkins University v. Hutton*, 488 F.2d 912 (4th Cir. 1973), the Court applied the following principle:

> Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. . . . This principle is stringently administered.

*See also, Oklahoma State Fair Exposition v. Lippert Bros., Inc.*, 243 F.2d 290 (9th Cir. 1957).

47. The failure of Fireside to raise the timeliness issue until February, 1979, nearly a year after the dispute over the $20,000.00 limit arose, indicates that Fireside was not standing on its right to timely payment, but in fact had allowed it to pass without comment and, thereby, waived it. Fireside is estopped from raising the issue now. The rule having application to this issue is that "Equity . . . fashions its own time limitations, through laches, the doctrine . . . that equity will not aid a party whose unexcused delay would, if his suit were allowed, prejudice his adversary. [Citation omitted]. The bare fact of delay creates a rebuttable presumption of prejudice. [Citation omitted]" *International Telephone and Telegraph Corp. v. General Telephone and Electronics Corp.*, 518 F.2d 913, 926 (9th Cir. 1975). The Hawaii Supreme Court has similarly stated:

> A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights or acquiesced for a great length of time. Nothing can call forth this Court into activity, but conscience, good faith and reasonable diligence. When these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced. *Ishida v. Naumu*, 34 Haw. 363, 372 (1937).

*See* also, *Lucas v. American-Hawaiian Engineering & Construction Co.*, 16 Haw. 80 (1904).

### ORDER

IT IS HEREBY ORDERED that the balance of the Fireside Thrift claim remaining unpaid after Hasegawa Komuten (U.S.A.) makes payment will continue to be secured by the Kealohas' Puna property and the home, until the Kealohas pay the remaining principal plus all additional interest in full.

AND IT IS FURTHER ORDERED that payment by the Kealohas of Fireside Thrift's remaining principal balance and additional accrued interest, as indicated above, in full, shall operate as a full and complete discharge and extinguishment of any and all debts owed by the Debtors to Fireside Thrift, including claims for reimbursement of attorneys' fees, costs and commissioner's fees.

AND IT IS FURTHER ORDERED that Fireside is hereby directed to assist and cooperate with the Debtors in completion of the contemplated mortgage loan to obtain funds to pay the deficiency due Fireside.