MAY DEMENT, Plaintiff-Appellant, *v.* ATKINS & ASH, Defendant-Appellee

NO. 7247

CIVIL NO. 55443

JULY 27, 1981

HAYASHI, C.J., PADGETT AND BURNS, JJ.

OPINION OF THE COURT BY BURNS, J.

Plaintiff-Appellant May Dement appeals the summary judgment entered in favor of Defendants-Appellees Atkins & Ash, a Hawaii

partnership. The issue is whether the matters on the record, viewed in the light most favorable to Mrs. Dement, show that there is no genuine issue as to any material fact. *Technicolor, Inc. v. Traeger*, 57 Haw. 113, 551 P.2d 163 (1976). We affirm the summary judgment.

Prior to this Civil No. 55443, Mrs. Dement sued Atkins & Ash (A&A) in Civil No. 54285, alleging in Count One that A&A induced her to enter into an agreement regarding development of her property through fraud and misrepresentation. In Count Two she alleged "that in the transaction described [in Count One] defendant was guilty of gross negligence and mismanagement."[1] On July 25, 1978, the lower court dismissed said complaint without prejudice for failure to state the circumstances constituting the fraud with particularity as required by Hawaii Rules of Civil Procedure (HRCP), Rule 9(b).

On August 16, 1978, Mrs. Dement filed a complaint in this case containing the same allegations as the complaint in Civil No. 54285, together with the following added specifics: That A&A promised that Mrs. Dement would pay a fee only if the development was successful and only in proportion to its success; that A&A misappropriated $18,197.13 of her money on fees to itself and expenses long before any determination could be made as to the success of the development; and that A&A caused roughly $20,000.00 in architects' and engineer's fees to be billed to Mrs. Dement in violation of its agreement with her that she would not be charged any fees unless the development proved successful.

The facts[2] show that Mrs. Dement owned 13 contiguous lots with a total land area of 79,849 square feet zoned R-6 residential. Of her land, 69,457 square feet was leased to Dan D. Hirahara for a 60 years' term commencing January 1, 1962, and 10,000 square feet was subleased to him until July 31, 1979.

After many unsuccessful attempts to find a developer for the property, Mrs. Dement, on April 29, 1977, signed an Exclusive

---

[1] Since the transaction described in Count One was the entering into the agreement, read literally Count Two alleges that in entering into the agreement, A&A was "guilty of gross negligence and mismanagement."

[2] The record is fairly complete. It contains all relevant documents, and Mrs. Dement's version of the events is stated in a 219-page deposition and a two-page affidavit.

Right-To-Lease Vacant Land Listing Form effective through December 31, 1977, authorizing Bradley-McCarter, Ltd., and its employee John Longenheim to find a lessee-developer.

Through Mr. Longenheim, A&A became interested in developing the property. The first time Mr. Atkins and Mr. Ash met Mrs. Dement was on November 12, 1977, at the Territorial Tavern, where A&A proposed a development. Mr. Dement and Mr. Longenheim were also present. The parties left the meeting with the understanding that A&A was to, in Mrs. Dement's words, "draw up some papers."

Two days later, on November 14, 1977, Mr. Atkins, Mr. Ash, and Mr. Longenheim went to Mrs. Dement's home. They were there for a half-an-hour or less. They presented a three-page typewritten document entitled "Professional Management Agreement" (PMA), which Mrs. Dement and A&A signed. Before signing it, Mrs. Dement glanced at it but did not read it. In her words, she "just trusted Mr. Longenheim." No one made any representations to her about the content of the PMA. When she signed it, she knew that Mr. Atkins and Mr. Ash were developers and that the PMA was an agreement.

In the PMA, *inter alia,* Mrs. Dement (1) appointed A&A "exclusively to manage the development of the property" through December 31, 1978; (2) agreed to pay them $3,000.00 per month in advance or 35 percent of the profit derived from the project, whichever is greater, and 6 percent of the sales price less any commissions paid to real estate brokers; and (3) authorized A&A at her expense to contract for architectural, electrical, mechanical, civil, soils, and structural services and to apply for financing and for rezoning, subdivision, and building permits.

At some point in time, Mrs. Dement received an eight-page folio of papers which A&A's cover letter dated November 14, 1977, described as a "Development Package." She is not sure whether she received it with the PMA or after, but if it was given to her when she received the PMA, she glanced at it but did not read it before she signed the PMA.

At one point in the Development Package, it says that "a property owner only pays a fee if the development is successful and only pays in proportion to how successful the development is." At another, it specifically itemizes an expense for "Development Management."

Thereafter, Mrs. Dement obligated herself to pay the architects' fees by signing a Standard Form of Agreement Between Owner and Architect, dated December 1, 1977.

On November 29, 1977, Mr. and Mrs. Dement borrowed $20,000.00 from AMFAC Financial Corp. The credit application, signed by Mrs. Dement on November 15, 1977, indicated that the proceeds were to be used for "property development." The $20,000.00 was placed in an account from which either the Dements or A&A could draw. After $18,097.13 was spent[3] Mrs. Dement withdrew the remaining $1,902.87.

The project never materialized because Mrs. Dement and A&A were unable to get Mr. Hirahara to sell his lessee's interest or to participate in the project.

Considering the way she twice stated Count One of her cause of action, it is obvious that Mrs. Dement recognizes the problem created by the existence of the PMA which she signed.[4] Rather than claiming a breach of the PMA, she claims that the agreement is void or voidable because she was induced to enter it through fraud and misrepresentation and she asks for damages caused her by the fraudulent inducement.

To constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but reasonably believed true by the other party, and (4) upon which the other party relies and acts to her damage. *Bank of Hawaii v. Allen,* 2 Haw. App. 185, 628 P.2d 211 (1981).

Moreover, in dealing with written contracts, the standard of proof with respect to a showing of fraud is extremely high. A written contract will be cancelled because of fraud only in a clear case and upon strong and convincing evidence. *Kang v. Harrington,* 59 Haw. 652, 587 P.2d 285 (1978); *Dobison v. Bank of Hawaii,* 60 Haw. 225, 587 P.2d 1234 (1978).

---

[3] The greater portion was spent as follows: $2,000.00 to the architect, $2,336.00 to the appraiser, $1,900.00 to the surveyor, $476.00 for interest on the AMFAC loan, and $10,600.00 to A&A in payment of its monthly fee.

[4] *See Fireside Thrift of Hawaii, Inc. v. Kealoha (In Re Kealoha),* 2 B.R. 201 (B.Ct.D.Haw. 1980); 17 AM. JUR.2d *Contracts* § 149 (1964); and 37 AM. JUR.2d *Fraud and Deceit* § 268 (1968).

Even viewed in the light most favorable to Mrs. Dement, there are no facts on the record to show that A&A made any representations prior to the time she signed the PMA or to show that she relied upon any such representations when she signed it.

Understandably, she is unhappy because although the project was a failure, she paid out $18,197.13 in expenses and was liable for additional architects' and engineer's fees. However, the facts clearly indicate that Mrs. Dement is complaining about what did and did not happen after she signed the PMA. They show that she became aware of A&A's alleged commitment that she would not have to pay any fees of any kind, not to A&A or to the architect(s) or to the engineer, after she signed the PMA and therefore it cannot be said to have induced her to sign the PMA. Consequently, it is impossible for her to establish all of the elements necessary to prove fraudulent inducement.

Turning to Count Two, with some difficulty we construe it to be an allegation of A&A's gross negligence and mismanagement under the PMA. This allegation has no support on the record. Moreover, its dismissal was not addressed by Mrs. Dement's counsel either in the briefs or at oral argument.[5] Consequently, we deem the appeal as to it to have been waived. *State v. Kahua Ranch,* 47 Haw. 466, 390 P.2d 737 (1964), *reh. denied,* 47 Haw. 485, 391 P.2d 872 (1964).

The summary judgment is affirmed.

*D. N. Ingman* for plaintiff-appellant.

*Kenneth R. Kupchak (Naomi Sakamoto* with him on the briefs) *(Damon, Key, Char & Bocken)* for defendant-appellee.

---

[5] The entire focus of this case and the prior case has been on the fraudulent inducement issue. The gross negligence and mismanagement claims have been completely ignored by all participants in this case. However, the summary judgment effectively decided all issues in the case.